352 F.2d 313
 BENRUS WATCH COMPANY, Inc., a Corporation, Belforte Watch Company, Inc., a Corporation, and Oscar M. Lazrus, Individually and as an officer of Aforesaid Corporations, and Harvey M. Bond, Stanley M. Karp, Samuel M. Feldberg, Jay K. Lazrus, Robert Weil, Martin J. Rasnow, Leo Hyman, and Julian Lazrus, Individually and as officers of Benrus Watch Company, Inc., Petitioners,
v.
FEDERAL TRADE COMMISSION, Respondent.
Clifford SEIGMEISTER, Petitioner,
v.
FEDERAL TRADE COMMISSION, Respondent.
 No. 17692.
 No. 17821.
 United States Court of Appeals Eighth Circuit.
 November 4, 1965.
 
 COPYRIGHT MATERIAL OMITTED Harry I. Rand, of Weisman, Allan, Spett & Sheinberg, New York City, for petitioners.
 Harry I. Rand, Milton C. Weisman and Warren F. Schwartz, of Weisman, Allan, Spett & Sheinberg, New York City, for petitioners Benrus Watch Co. et al.
 Harold W. Wolfram of Burke & Burke, New York City, for petitioner Seigmeister.
 John Gordon Underwood, Atty., Federal Trade Commission, Washington, D. C., J. B. Truly, Asst. Gen. Counsel, Miles J. Brown, Atty., Federal Trade Commission, Washington, D. C., on brief for respondent.
 
 
 1
 Before VAN OOSTERHOUT and RIDGE, Circuit Judges, and HENLEY, District Judge.
 
 
 2
 HENLEY, District Judge.
 
 
 3
 These are petitions for judicial review of a final order of the Federal Trade Commission, issued on February 28, 1964, commanding petitioners to cease and desist from certain trade practices found by the Commission to violate section 5(a) (1) of the Federal Trade Commission Act, 15 U.S.C.A. § 45(a) (1). The basis for such review is 15 U.S.C.A. § 45(c).[1]
 
 
 4
 The principal petitioners are Benrus Watch Company, Inc., and its wholly owned subsidiary, Belforte Watch Company, Inc. The individual petitioners are officers or former officers of the corporate petitioners. Throughout most of this opinion the individual petitioners will be ignored, and the corporate petitioners will be referred to collectively as Benrus.
 
 
 5
 Benrus is a New York corporation having its principal place of business in New York City. It manufactures and sells in interstate commerce men's and women's watches. There is no question that Benrus is subject to the jurisdiction of the Commission.
 
 
 6
 Benrus watches in general are sold to retail outlets and to mail order and catalog houses, which in turn sell the watches to consumers for cash or on credit. The Commission's complaint against Benrus was issued in January 1959, and the period covered by the evidence extended from 1955 onward. The complaint preferred eight charges of unfair and deceptive practices, which charges Benrus denied, although, as will be seen, Benrus admitted many of the underlying facts set forth in the complaint.
 
 
 7
 In an initial decision rendered on May 24, 1962, the Hearing Examiner in charge of the case found that Benrus had been guilty of illegal practices in two of the respects charged and recommended the issuance of a cease and desist order with respect to those practices. Other charges were dismissed.
 
 
 8
 Both sides sought and received review by the Commission. On July 31, 1963, the Commission filed an opinion in which it was found that the Examiner should be sustained to the extent that he had determined that Benrus was guilty of unlawful practices. The Commission further found, however, that other charges contained in the complaint had been established notwithstanding the contrary conclusion of the Examiner.
 
 
 9
 Contemporaneously with the filing of its opinion just mentioned, the Commission promulgated a proposed order substantially broader than that recommended by the Examiner. On September 11, 1963, petitioners objected to the proposed order; counsel supporting the complaint replied to the objections; and the Commission determined that the objections should be overruled. As indicated, the final order of the Commission was filed on February 28, 1964. The restraints contained in the final order are those set forth in the proposed order of July 31, 1963.
 
 
 10
 In the instant petitions it is claimed that the Commission's findings of violations of section 5(a) (1) of the Act are not sustained by substantial evidence, that in certain respects the order of the Commission is too broad, and that even if the Commission is not reversed outright, the cause should be remanded to the agency for further proceedings. The Commission contends that its order was properly issued, and that the case should not be remanded.
 
 
 11
 In substance, the complaint issued by the Commission charged Benrus with unfair and deceptive practices in connection with its "preticketing" of its merchandise with purported retail prices and in connection with activities and practices related to such preticketing, with unfair and deceptive practices in connection with Benrus guarantees of watches including the advertising of such guarantees, in connection with the description of Benrus watches as being "shock-proof" or "shock-protected," and in connection with the markings or absence of markings of its watches in relation to the composition of the bezels of the watches.[2]
 
 
 12
 The Commission found Benrus guilty of unfair and deceptive practices in the areas just mentioned and ordered Benrus to cease and desist from such practices. An original charge that Benrus had falsely advertised that certain low-priced watches were available to Benrus outlets, and another charge relating to the composition of the bezels were dismissed by both the Examiner and the Commission.
 
 
 13
 The principles governing our review of the challenged order are well established. We do not try the case de novo. It is for the Commission, rather than the courts, to weigh the evidence, appraise the credibility of witnesses, resolve conflicts in testimony, and draw legitimate inferences from the testimony and from the underlying facts proved by the evidence. If the Commission's factual findings are supported by substantial evidence, they are conclusive and binding upon us. But, Commission findings or rulings which are not supported by substantial evidence, or which are arbitrary or capricious, or which proceed from an erroneous view of the law cannot be sustained. Corn Products Refining Co. v. F. T. C., 324 U.S. 726, 65 S. Ct. 961, 89 L.Ed. 132; F T. C. v. Pacific States Paper Trade Association, 273 U.S. 52, 47 S.Ct. 255, 71 L.Ed. 534; Continental Wax Corporation v. F. T. C., 2 Cir., 330 F.2d 475; National Trade Publications, Inc. v. F. T. C., 8 Cir., 300 F.2d 790; United States Retail Credit Association v. F. T. C., 4 Cir., 300 F.2d 212; Chain Institute, Inc. v. F. T. C., 8 Cir., 246 F.2d 231.
 
 I.
 
 14
 It is admitted by Benrus that during the period between 1955 and 1959, which was the period covered by the complaint and by the evidence, Benrus watches were "preticketed" before being distributed to the customers of Benrus. That is to say, each Benrus watch when it left the Benrus plant had attached to it or to its container a tag indicating a purported retail price for the watch.
 
 
 15
 Benrus admits further that during the period in question it advertised from time to time that prospective purchasers of Benrus Watches could obtain substantial trade-in allowances against the quoted or preticketed retail price by turning in old watches when new Benrus watches were acquired.
 
 
 16
 And Benrus admits still further that during a short period of time in 1958 it advertised, notably in the April 1958 issue of Reader's Digest, that an allowance of $5.00 could be obtained by presenting to Benrus dealers a detachable coupon or "allowance certificate" which was part of the ad.
 
 
 17
 The complaint charged that the preticketing itself was unfair and deceptive in that the preticketed price, which conveniently may be called the "list price", was substantially in excess of the prices at which Benrus watches were regularly and usually sold in the retail market, that the watches actually sold in the market at varying prices substantially below the list price, and that indeed during the relevant period there was no regular and usual retail market price for Benrus watches. It was and is the position of the Commission that this preticketing of list prices created the impression in the minds of a substantial portion of watch purchasers that the list prices were in fact the usual and regular prices at which Benrus watches were sold at retail in the trade area, and that this alleged impression caused many individuals to buy Benrus watches at prices lower than list under the mistaken belief that they were thereby effecting a saving or "getting a bargain." The Commission considered that the practice in question had the tendency to induce purchasers to buy from Benrus dealers without shopping further, and thus that it had an adverse effect on competition in the retail watch trade.
 
 
 18
 The Commission also took the position that the advertising about trade-in allowances and allowance certificates was false and deceptive because it was geared to the allegedly deceptive list prices of the watches, and that the allowances were in fact fictitious. Moreover, it was said that Benrus dealers did not uniformly honor the allowance certificates when presented.
 
 
 19
 The Examiner found against Benrus with respect to the preticketing itself and with respect to the advertising of the allowance certificates, but dismissed the charge based on the advertising of trade-in allowances. The Commission found against Benrus on all three counts.
 
 
 20
 It is settled that deceptive preticketing of retail prices by a manufacturer of a product is unlawful, and it is immaterial that the actual "marking down" from the preticketed price is done by a retailer rather than the manufacturer. See Rayex Corporation v. F. T. C., 2 Cir., 317 F.2d 290; Helbros Watch Co. v. F. T. C., 114 U.S.App.D.C. 63; 310 F.2d 868; Baltimore Luggage Co. v. F. T. C., 4 Cir., 296 F.2d 608; Clinton Watch Co. v. F. T. C., 7 Cir., 291 F.2d 838; Niresk Industries, Inc. v. F. T. C., 7 Cir., 278 F.2d 337. Benrus does not question those principles; it simply contends that its practices with regard to list prices were not deceptive, and that the Commission's findings of deception and illegality with respect to those prices are not supported by substantial evidence.
 
 
 21
 In support of its contentions Benrus argues first that during the period under consideration by the Examiner manufacturers' list prices, although not without significance to consumers as rough guides to the "value" of products, as compared to the "value" of other products, and as indications of "ceiling prices" to be paid for the preticketed product, did not indicate to consumers that the list prices were in fact the regular, usual, or prevailing retail prices actually paid in the market for the preticketed product. Hence, Benrus urges, the consuming public was not deceived by preticketed prices even though they might have been substantially higher than actual prevailing prices or even though a product has no general or prevailing retail price. In support of that argument Benrus relies heavily on the results of a market research study, conducted by a firm known as Motivation Dynamics, Inc., which was undertaken on behalf of Benrus after the Commission issued its complaint.
 
 
 22
 Benrus argues next that in December 1963 the Commission issued, effective January 8, 1964, new "Guides Against Deceptive Pricing," and that under those new guides the practices complained of would not be considered deceptive. Benrus contends that its conduct should be measured by reference to the new guides, and that the Commission erroneously applied older criteria of deceptiveness.
 
 
 23
 Benrus asks that the portions of the Commission's order relating to preticketing be vacated or, in the alternative, that the case be remanded to the Commission for reconsideration in the light of the new guide lines.
 
 
 24
 Whether a trade practice such as preticketing of list prices or advertising with respect to manufacturers' list prices is deceptive depends in the last analysis on the impression which such a practice makes on the minds of the consuming public. What impression is made by a given practice is a question of fact for the Commission to determine, and the Commission's determination that a practice is deceptive should not be disturbed by the courts unless arbitrary or clearly wrong. Niresk v. F. T. C., supra; Kalwajtys v. F. T. C., 7 Cir., 237 F.2d 654; Rhodes Pharmacal Co., Inc., v. F. T. C., 7 Cir., 208 F.2d 382.
 
 
 25
 The Commission has consistently taken the view, and has been upheld therein by the courts, that a manufacturer's list price creates in the minds of a substantial segment of the purchasing public the impression that such price is in fact the regular and usual retail price of the product in the market, and that a bargain is obtained if the product can be obtained at an actual price substantially lower than list.
 
 
 26
 Prior to the promulgation of the new guides the Commission held consistently that a list price was deceptive if it was substantially in excess of the prevailing actual retail price or if there was no generally prevailing retail price. And deception was considered established if there was a substantial volume of sales of the preticketed product at actual prices substantially less than list. Those were the criteria which the Examiner applied in his initial consideration of the case and which the Commission applied when it issued its opinion and proposed order in July 1963.
 
 
 27
 The new guides reiterate the Commission's view that preticketed prices indicate to a substantial portion of the purchasing public that those prices are the generally prevailing actual retail prices of the products involved, and that preticketing can be a deceptive and unlawful trade practice. The new guides, however, do reflect one significant change in the Commission's approach to the preticketing problem. Under the new guides the preticketing of a list price of a product will not be deemed deceptive if the preticketing is done in good faith, and if the list price "does not appreciably exceed the highest price at which substantial sales are made in (the) trade area."
 
 
 28
 As to the good faith of the manufacturer who pretickets retail prices, the new guides emphasize that the manufacturer, or other distributor who does the preticketing, "must in every case act honestly and in good faith in advertising a list price, and not with the intention of establishing a basis, or creating an instrumentality, for a deceptive comparison in any local or other trade area."
 
 
 29
 Benrus contends that in preticketing list prices it acted in good faith, and that substantial sales of Benrus watches were made at the list prices so that its conduct, if measured by the new guides, was not deceptive even if it would have been considered so under the old criteria. For the moment we pass over that particular contention.
 
 
 30
 Judging the conduct of Benrus by the former standards, we are persuaded that the Examiner and the Commission were justified in finding from the evidence of record that the preticketing of Benrus products and Benrus advertising referring to list prices of watches were deceptive practices and were unlawful.
 
 
 31
 The record in this case and the initial decision of the Examiner in Majestic Electric Supply Co., Inc., FTC Docket No. 8449, indicate that there is a school of thought today in the field of retail marketing which holds that consumers are attaching less and less significance to list prices as indicia of actual retail market prices.
 
 
 32
 In the course of the hearings before the Examiner in this case Mr. Albert Shephard, the president of Motivation Dynamics, expressed the opinion that an "overwhelming majority" of watch purchasers consider list prices in the light of their impression that "most people now-adays pay less than list prices for watches that they purchase in the medium-priced field." He also stated that the impression of most people is that the list price of a product is not its usual and regular price, and that most people are aware that outlets exist where medium priced watches can be obtained for less than list and that more and more people are buying for less than list as time goes by.
 
 
 33
 Shephard expressed the further view that consumers tended to consider list prices as fixed ceilings. With regard to list prices as measures of "value," as opposed to "price," he stated that it was his opinion that if the same manufacturer lists one price for one brand of watch and lists a higher price for another brand watch customers will consider that the latter brand is "worth" more than the former, and that if two manufacturers list similar prices for similar brands, customers will consider that the product of one manufacturer is "worth" about as much as that of the other.
 
 
 34
 But even if Mr. Shephard's testimony and the report of his firm are taken at face value, we think that the Examiner and the Commission were justified in concluding that list prices still indicate actual regular retail prices to a substantial percentage of the watch buying public, a percentage that is entitled to protection from deceptive preticketing.
 
 
 35
 The Examiner and the Commission also found that there were substantial sales of Benrus watches at retail prices substantially less than the list prices, that in numerous instances purchasers acquired Benrus watches at the same lower than list prices regardless of whether they turned in old watches as trade-ins, and that Benrus dealers did not uniformly honor the allowance certificates to which reference has been made. Those findings are clearly supported by substantial evidence.
 
 
 36
 The Commission found that Benrus sells watches to catalog and mail order houses and supplies those purchasers with inserts for their catalogs. Those inserts, prepared by Benrus, refer to the list prices of the watches and then show "code prices" which represent the actual retail prices which consumers are to pay for the watches if they order from the catalog. Those code prices, prescribed by Benrus itself, are substantially lower than the list prices. Those findings are likewise supported by the evidence and, indeed, are not challenged here.
 
 
 37
 Returning now to the contention of Benrus based on the new guides, it must be remembered that the new guides had not been promulgated when the Examiner filed his initial decision and when the Commission filed its opinion and issued its proposed order. Nor had they been promulgated when Benrus objected to the proposed order. It is true that the final order of the Commission was filed nearly two months after the effective date of the new guides, but, as has been seen, the case was actually decided under the old criteria.
 
 
 38
 It would not have been improper, of course, for the Commission to have reviewed the record in the light of the new guides before issuing its final order in February 1964, but we do not feel that it was its mandatory duty to do so, or that it abused its discretion when it did not do so.
 
 
 39
 In this connection we note that it is the announced policy of the Commission to interpret all outstanding cease and desist orders as though they expressly incorporated the provisions of the new guides, regardless of the actual language appearing in the orders. See Heavenly Creations, Inc. v. F. T. C., 2 Cir., 339 F.2d 7; and In re Clinton Watch Co., F.T.C. Docket No. 7434.
 
 
 40
 In concluding that the contention based on the new guides must be rejected we do not overlook the fact that on the same day on which the Commission's final order in this case was filed, the Commission handed down its opinion in Majestic Electric Supply Co., Inc., supra. That case, like this one, involved among other things preticketing of retail prices during a period prior to the effective date of the new guides. And in that case, as in this, the initial finding of the Examiner, based on the old criteria, was that the respondent had been guilty of deceptive preticketing. Upon review the Commission reversed that finding. It was said:
 
 
 41
 "The evidence in this case establishes that some of the articles listed in respondents' catalog were not usually and regularly sold in certain communities in which the catalog was disseminated at the represented higher `Retail' prices. But no showing was made, and, in view of the allegations of the complaint, no attempt was made to show, that the so-called `Retail' prices were appreciably in excess of the highest price at which substantial sales of the merchandise were being made throughout the area in which respondents' catalog was circulated. Consequently, the record does not support a finding that respondents' claims as to the `Retail' prices of their merchandise were deceptive under the new pricing guides. That part of the complaint challenging respondents' use of such claims will be dismissed."
 
 
 42
 To distinguish Majestic Electric from the case at hand it is sufficient to say that in Majestic Electric the Commission decided the case after the new guides had gone into effect, whereas here the actual agency decision was made before the effective date of the guides. As has been said, we do not feel that the Commission abused its discretion in refusing to reconsider the merits of the case after the new guides became operative.
 
 
 43
 The record reveals that on July 12, 1962, Benrus filed a motion requesting the Commission to stay proceedings herein pending an industry-wide investigation of preticketing practices of watch manufacturers. On September 11, 1962, the Commission determined that it would hold that motion in abeyance pending decision on the merits. The Commission never ruled on the motion as such, but it overruled it by implication when it entered its cease and desist order. Benrus complains of that action of the Commission, but we think that the matter lay within the discretion of the Commission and will not disturb the Commission's exercise of that discretion.
 
 II.
 
 44
 Taking up next the controversy with respect to Benrus guarantees and the advertising thereof, the record reflects that prior to January 1, 1959, Benrus watches were guaranteed against defects in material and workmanship. Those guarantees were honored, but the owner of a Benrus watch who sent the instrument in to the company for repair was required to pay a service charge of $1.00 for handling and postage even though the defect to be repaired was covered by the guarantee. The terms of the guarantee were set forth correctly in the certificate of guarantee accompanying each new Benrus watch; that certificate also reflected the service charge requirement but did not do so clearly, and the requirement appeared in small print some distance away from the guarantee provisions proper. In Benrus advertising statements appeared that Benrus watches were "guaranteed," or "fully guaranteed," or "guaranteed by Benrus." The advertisements did not disclose any limitation on the guarantee and said nothing about the service charge.
 
 
 45
 Several months prior to January 1, 1959, Benrus adopted and put into effect as of that date, which was prior to the issuance of the Commission's complaint, an entirely new guarantee policy. Under the new policy all Benrus watches are guaranteed without any limitation and without any service charge for a period of three years. That is to say, under the new policy if a Benrus watch gets into disrepair for any reason during the period of the guarantee it will be repaired or replaced without any cost to the owner.
 
 
 46
 The Examiner dismissed the charges based on alleged deceptive practices relating to the guarantees and advertising thereof on the ground that in view of the new policy which has been mentioned a cease and desist order would not be appropriate. He also found that actually there was no deception under the original policy.
 
 
 47
 The Commission reversed the Examiner on this phase of the case, holding that the original policy was deceptive. The new policy was not discussed by the Commission.
 
 
 48
 In reviewing the findings of the Commission we must consider the record as a whole. While the findings of the Examiner were certainly not binding upon the Commission, they are part of the record, and are entitled to consideration in appraising the correctness of the ultimate findings of the Commission. Universal Camera Corporation v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; Evis Manufacturing Co. v. F. T. C., 9 Cir., 287 F.2d 831; Minneapolis-Honeywell Reg. Co. v. F. T. C., 7 Cir., 191 F.2d 786.
 
 
 49
 The final order of the Commission commands Benrus to cease and desist from representing, directly or by implication, that its merchandise is guaranteed "unless the nature and extent of the guarantee and the manner in which the guarantor shall perform thereunder are clearly and conspicuously disclosed." The facts about the original guarantee policy and the advertising thereof are not in dispute, and we cannot say that the Commission's finding of deception was arbitrary or impermissible even though we may entertain some doubt as to whether the matter complained of had any real tendency seriously to deceive anyone. Cf. Parker Pen Co. v. F. T. C., 7 Cir., 159 F.2d 509. We accordingly accept the Commission's finding of deception and illegality with respect to the original policy.
 
 
 50
 Whether in view of the change of policy which has been mentioned the Commission should have ordered Benrus to cease and desist from deceptive representations as to guarantees presents a more serious question.
 
 
 51
 It is well established that a mere abandonment of a deceptive practice does not necessarily render a cease and desist order improper. This is true because an abandoned practice may be resumed. Cease and desist orders are not punitive, and they operate prospectively. Whether such an order should be entered in a case where the unlawful practice has been abandoned is a question which rests within the sound discretion of the Commission. See in this connection: Giant Foods, Inc. v. F. T. C., 116 U.S.App.D.C. 227, 322 F.2d 977; Marlene's Inc. v. F. T. C., 7 Cir., 216 F.2d 556; New Standard Publishing Co. v. F. T. C., 4 Cir., 194 F.2d 181; Oregon-Washington Plywood Co. v. F. T. C., 9 Cir., 194 F.2d 48; Deer v. F. T. C., 2 Cir., 152 F.2d 65; Eugene Dietzgen Co. v. F. T. C., 7 Cir., 142 F.2d 321.
 
 
 52
 The Commission did not quarrel with the finding of the Examiner that the original deceptive practices relative to guarantees had been abandoned, and we think that the Commission might well have upheld the Examiner in dismissing the charge relating to the guarantees. We cannot say, however, that the Commission in determining to order Benrus to cease and desist from deceptive representations as to guarantees, notwithstanding its abandonment of the practice originally complained of, was an abuse of discretion or that in the exercise of its discretion the Commission failed to act "within the bounds of reasonableness." Marlene's, Inc. v. F. T. C., supra, 216 F.2d at 559. As we have said, the order is not punitive, and compliance with it will not be hurtful or burdensome.
 
 III.
 
 53
 The controversy about the use of the term "shock-proof" or "shock protected" in Benrus advertising is a minor matter. It appears that one or both of those terms were inadvertently included in a single advertising mat and appeared in two Benrus advertisements. There is evidence that no watch is proof against shock and that no watch can be protected completely from damage due to shock. Watches can be made which are "shock resistant" or "shock absorbing," and in general Benrus has employed those terms in its advertising and has refrained from using the terms of which the Commission complained.
 
 
 54
 The Examiner found that the use of the terms "shock-proof" and "shock protected" was not absolutely prohibited; he also found that Benrus's use of those terms was isolated and inadvertent and did not require the issuance of a cease and desist order. The Commission reversed the Examiner and included within the prohibition of its order the use of the terms in question.
 
 
 55
 Again we are unable to say that the Commission abused its discretion, although were the question one for our independent determination we might well find ourselves in agreement with the Examiner.
 
 IV.
 
 56
 In Paragraph Ten of the complaint it was charged that Benrus watches "are in cases, the bezels of which have been treated or processed to simulate or have the appearances of precious metals, that is, gold or gold alloy." It was alleged that the cases were not marked so as to disclose that the bezels were composed of base metal, and it was charged the practice of Benrus "in offering for sale and selling watches with bezels which have been treated or processed to simulate or have the appearance of precious metal as aforesaid without disclosing clearly the true metal composition of said bezels is misleading and deceptive and has the tendency and capacity to lead members of the purchasing public to believe that the said bezels are composed of precious metal."
 
 
 57
 The Examiner construed the complaint as charging that Benrus had misled the public into believing that there was gold in the bezels when in fact there was none. The Examiner found as a fact that although the bezels were in the main composed of base metal, they were surfaced with a coat of gold plate and so did in fact contain some gold. On the basis of that finding, the Examiner dismissed the charge.
 
 
 58
 Upon review the Commission concluded that the Examiner had construed the complaint too narrowly, and that it was sufficiently broad to charge a violation of the Commission's Trade Practice Rules for the Watch Case Industry, promulgated in 1948, and appearing as Part 174 of Title 16 of the Code of Federal Regulations. The Commission found that Benrus had violated the rule appearing as 16 C.F.R. § 174.2(9) relating to flashed or deficiently plated cases.[3]
 
 
 59
 That Rule provides in substance that in respect of watch cases composed of a stock base metal plated or coated with a precious metal of a thickness of less than 1½/1000 of an inch over all exposed surfaces after completion of all finishing operations, the case shall be marked so as to show unambiguously and nondeceptively that the case is base metal or that it is base metal which has been flashed or coated with a very thin and unsubstantial coating, and that such further disclosure shall be made and action taken as to prevent deception or misunderstanding.
 
 
 60
 Two Benrus bezels were introduced in evidence. One of them had a plating of 18.46 carat gold of a depth of .00083 of an inch; the other had a plating of 18.32 carat gold of a depth of .0007 of an inch. There was evidence that Benrus bezels had the appearance of gold or gold alloy, and they were not marked in accordance with the rule. We hold that the finding of a violation with respect to the bezels is supported by substantial evidence.
 
 
 61
 With respect to the controversy over the bezels, Benrus contends principally in its brief that it was convicted of a violation with which it was not charged and which it had no opportunity to meet. In the Commission's opinion it is said:
 
 
 62
 "* * * The position of counsel supporting the complaint as to the interpretation of this paragraph of the complaint was clearly made known as the close of the case-in-chief in his reply to respondents' memorandum in support of motion to dismiss. It is in this document that the complaint counsel refers to the `thin skinned' products of respondents. Accordingly, the respondents were informed of this construction of the complaint and they had complete and adequate opportunity to defend on the issue. We believe it fair to say that the issue was directly brought into question by the language of the complaint."
 
 
 63
 We have examined the memorandum filed by Benrus in support of its motion to dismiss made at the close of Commission's case-in-chief and have also examined the reply memorandum filed by counsel supporting the complaint. In the Benrus memorandum counsel referred to the case of In re Theodore Kagan (sic) Corporation, F.T.C. Docket No. 6893, affirmed Theodore Kagen Corporation v. F. T. C., 109 U.S.App.D.C. 7, 283 F.2d 371, and pointed out that the bezels involved in that case had been colored to simulate gold but actually contained no gold. In the reply memorandum counsel supporting the complaint referred to the Benrus bezels as being "thin skinned," and then commented upon the low gold content of the electroplating. In view of this exchange between counsel we think that the Commission was justified in holding that Benrus was charged with knowledge that the Commission was complaining of the low gold content of the bezels rather than urging that the bezels contained no gold or gold alloy, and in concluding that Benrus had full opportunity to meet that complaint.
 
 
 64
 Benrus complains that the Commission's order as related to bezels prohibits practices with respect to the sale of watches which have been electrolytically gold plated which were not involved in this proceeding and which do not, in any event, constitute false and deceptive practices.
 
 
 65
 As to that particular complaint the record reflects that after Benrus filed in this Court its petition to review the Commission's order, it filed with the Commission a petition to reopen the proceeding to secure an adjudication of the sufficiency of the marking "20 Micron Gold Electroplate" appearing on the cases of certain watches which it has been marketing. On July 31, 1964, the Commission denied that motion but stated that it was directing its Bureau of Industry Guidance to institute a proceeding to determine whether revision of 16 C.F.R., § 16.172.2(9) was required, and that if it was determined that there should be a revision, Benrus might then request an appropriate modification of the Commission's order. We are not advised as to whether the revision proceeding has been instituted or completed or as to the result of such proceeding, if completed. In any event the order denying Benrus's motion to reopen is not before us.
 
 V.
 
 66
 Complaint is made that the order embraces all Benrus products whether or not related to the watch industry. Once violations of the law have been shown to exist, the Commission has broad discretion in devising a remedy adequate to prevent the same or similar violations in the future. F. T. C. v. Henry Broch & Co., 368 U.S. 360, 82 S. Ct. 431, 7 L.Ed.2d 353. Specifically, if deceptive practices have been employed with regard to certain products distributed by a manufacturer, such practices may be prohibited with respect to all of his products; the Commission is not required to limit its order to the particular product or products with respect to which violations have been found. Carter Products, Inc. v. F. T. C., 5 Cir., 323 F.2d 523; Niresk Industries, Inc. v. F. T. C., supra; Consumers Sales Corporation v. F. T. C., 2 Cir., 198 F.2d 404. In our opinion the Commission did not exceed its discretion in covering all Benrus products in its order.
 
 VI.
 
 67
 In No. 17,692 the individual petitioners, Robert Weil, Martin J. Rasnow, and Leo Hyman, complain that they were included in the order as individuals. And a similar complaint is made by Clifford Seigmeister in No. 17,821.
 
 
 68
 As far as Rasnow and Hyman are concerned, it appears from the order of the Commission that the proceedings against them as individuals were dismissed, and no more need be said about them.
 
 
 69
 As to Weil and Seigmeister, the complaint alleged that they were among the individuals who formulated, directed, and controlled the policies and practices of the corporate respondents.
 
 
 70
 On March 9, 1959, the corporate defendants and certain individual defendants, including Seigmeister, but not including Weil, filed an answer in effect admitting that certain of the individual respondents, among whom was Seigmeister, did in fact formulate, direct, and control the policies and practices of the corporate defendants. On April 13, 1961, Weil filed a belated answer denying that "he formulates, directs, or controls, or has formulated, directed or controlled any of the acts and practices of the corporate respondents alleged in the complaint, or that he has personal knowledge of such acts and practices."
 
 
 71
 The Seigmeister petition, which was dated and filed May 25, 1964, alleges that petitioner "resigned as an officer of the Benrus Watch Company, Inc. approximately five years ago and has not been connected with or associated with that company since his resignation."
 
 
 72
 The Examiner found specifically that Weil and Seigmeister formulated, directed, and controlled corporate policies and practices, and they were included as individuals in the Commission's order.
 
 
 73
 Neither the answer of Weil nor the petition of Seigmeister is verified, and neither has called the attention of the Court to any evidence indicating that they did not formulate, direct, and control corporate policies and practices.
 
 
 74
 Both Weil and Seigmeister say that the record contains no evidence that they as individuals had anything to do with Benrus policies or practices. Counsel supporting the complaint had a right to rely on the admission in the answer filed on behalf of Seigmeister and others, and Weil did not deny that he was an officer of Benrus which, standing alone, justifies the inference that he had something to do with policy.
 
 
 75
 It may very well be true that when Weil filed his answer, and when Seigmeister filed his petition for review, those respective individuals no longer had anything to do with Benrus policies, but that would not make their inclusion in the order erroneous if they occupied policy making or directing positions during the period of the violations charged in the complaint. Consumers Sales Corp. v. F. T. C., supra. And when carefully read, their pleadings do not actually deny that between 1955 and the date of the filing of the complaint in 1959 they were engaged in formulating, directing, and controlling Benrus policies and practices.
 
 
 76
 From what has been said, it follows that the order of the Commission is in all respects affirmed and enforcement thereof decreed.
 
 
 
 Notes:
 
 
 [1]
 The petition in No. 17,692 was filed directly in this Court. The petition in No. 17,821 was subsequently filed in the Court of Appeals for the District of Columbia and was transferred here under the provisions of 28 U.S.C.A. § 2112(a). The two petitions have been heard together
 
 
 [2]
 In the present context, a bezel is the grooved rim or flange in which a watch crystal is set
 
 
 [3]
 16 C.F.R. § 174.1(a) defines a watch case as including the bezel