JOSEPH A. KAPLAN & SONS, INC., a corporation, Petitioner,

v.

FEDERAL TRADE COMMISSION, Respondent.

No. 18380.

United States Court of Appeals District of Columbia Circuit.

Argued Dec. 1, 1964.

Decided May 13, 1965.

Mr. Gilbert H. Weil, New York City, for petitioner.

Mr. E. K. Elkins, Attorney, Federal Trade Commission, with whom Mr. James McI. Henderson, General Counsel, Federal Trade Commission, was on the brief, for respondent.

Before WASHINGTON, WRIGHT, and MC-GOWAN, Circuit Judges.

McGOWAN, Circuit Judge:

This case comes to us on a petition to review an order of the Federal Trade Commission directing petitioner Joseph A. Kaplan & Sons, Inc., (Kaplan), a manufacturer of shower curtains, to cease and desist from certain conduct. After administrative proceeding, the propriety of which is not questioned, the Commission held that Kaplan had violated Sections 2(a), 2(d), and 2(e) of the Robinson-Patman Act, 49 Stat. 1526 (1936), 15 U.S.C. §§ 13(a), (d), and (e). It thereupon entered the order under review.

The Commission made the following findings, which we believe to be supported by substantial evidence, regarding the operation of Kaplan's business. A significant portion of Kaplan's business dur-ing the years in question consisted of sales nominally to Aimcee Wholesale Corporation (AWC), the wholly-owned subsidiary of Associated Merchandising Corporation (AMC), which is in turn owned by 26 large retail department stores located throughout the country (AMC stores). When an AMC store wanted to purchase some of Kaplan's products, it usually placed its order with AWC, which transmitted the order together with shipping instructions to Kaplan, who then drop-shipped the merchandise to the ordering store. Occasionally AMC stores bought directly from Kaplan. Kaplan also negotiated "advertising allowances" and "markdown allowances," both on goods sold directly to the AMC stores and on goods sold through AWC, directly with those stores. However, such allowances were reflected in credits issued by Kaplan to AWC, which in turn credited the individual stores. Kaplan's salesmen frequently visited the AMC stores, as well as other retailer customers, to examine their stocks, anticipate merchandising problems, and recommend sales measures. In short, the Commission concluded, with the exception of the mechanics of ordering and billing, Kaplan dealt with the AMC stores just as though AWC did not exist.

The Commission further found that the prices at which Kaplan sold to AWC were substantially lower than those it charged competitors of the AMC stores, and that, even after paying AWC's costs, the AMC stores were able to sell Kaplan products competitively at a higher profit than their competitors.[1] It also found that Kaplan regularly granted "markdown allowances" to some of its customers, including the AMC stores, with the effect that those customers ultimately paid lower prices for Kap-

---

1. During 1958 and 1959, Kaplan showed two sets of prices on its price lists, "cost" and "retail," or "list." "Cost" represented the price paid by retailers on purchases direct from Kaplan, "retail," Kaplan's suggested price for retail sales to the public. Orders placed through AWC were billed to it at "retail," or "list," less a discount of 50%, and AWC billed the AMC stores at "list" prices less 47½%. The AMC stores thereby enjoyed a cost advantage of up to 18% over their competitors.

Prices for Kaplan's "Aquafaille" line were negotiated separately, but the AMC stores paid from 5 to 15% less for this line as well.

lan merchandise than their competitors.[2] Kaplan paid several of its customers, among them the AMC stores, allowances on goods purchased directly and through AWC as compensation for their advertising its products.[3] In addition, it granted some retailers separately stated "advertising allowances" on patterns which, it claimed, were being discontinued. Comparable allowances were not made, or offered, to all of its retailer customers. Finally, Kaplan allowed several of its customers, including AMC stores, to return unsold merchandise for credit, in order to help them clear excess stock. Credits were issued both through AWC and directly, depending on the route of the original sale. Not all of Kaplan's retailer customers received, or indeed knew of, this privilege.

██ On the basis of these and certain additional findings,[4] the Commission concluded that the individual AMC stores, and not AWC, "were the purchasers and customers for the purposes of the Robinson-Patman Act." The differences between the prices at which Kaplan billed AWC and those at which it sold to competitors of the AMC stores, and the "markdown allowances" granted to AMC stores and other favored customers, the Commission held, were discriminations in price likely "substantially to lessen competition" within the meaning of Section 2(a) of the Act. It further ruled that Kaplan's advertising allowances violated Section 2(d) because they were "not made available to competing customers on proportionally equal terms,"[5] and that Kaplan's practice of permitting certain customers to return merchandise for credit constituted the furnishing of a service in connection with the sale of its products pro-

2. Through such "markdown allowances" Kaplan in effect shared with its favored customers the cost of selling their slow-moving stock at a discount. These allowances were granted usually just prior to the introduction of a new line of merchandise, and they were negotiated on an individual store basis. Thus some of Kaplan's customers received the allowances while others who competed in the sale of its products did not.

Kaplan contended that these allowances came within the changing conditions of marketability proviso of Section 2(a), since they were designed to stimulate the sale of slow-moving merchandise. The Commission rejected this defense on the ground that Kaplan had failed to demonstrate that the goods on which allowances were granted were in fact slow-moving, at the same time questioning whether even such a showing would be sufficient. Inasmuch as we think the record supports the Commission's first ground, we express no opinion regarding its alternative reliance on the second.

3. The Commission was of the view that Kaplan conceded the illegality of these discriminatory allowances for promotion of its products, and, indeed, it does not appear that Kaplan has sought to retreat from that position here.

It does, however, defend its practice of granting advertising allowances on purchases direct from its inventory in connection with "close-out" sales. The Com-

mission conceded, *arguendo*, that these allowances were given on lines that were about to be discontinued, but it rejected Kaplan's argument that the fact of discontinuance served to distinguish these lines from others of "like grade and quality." Moreover, it pointed out that many of Kaplan's customers were never given the opportunity to buy the lines on which it gave allowances and concluded: "The withholding of an opportunity to buy the special pattern was in effect a withholding of an opportunity to share in the allowance."

4. The Commission relied, *inter alia*, on the regularity and the closeness of Kaplan's dealings with the AMC stores directly, on evidence that it actually influenced the terms at which those stores bought from AWC, and on the fact that Kaplan knew, or should have known, that the special prices at which it sold to AWC inured directly to the benefit of the AMC retailers. It reasserted the proposition that "the corporate entity may be disregarded when the failure to do so would enable the corporate device to be used to circumvent a statute." We agree. See, *e.g.*, American News Co. v. FTC, 300 F.2d 104 (2d Cir.), cert. denied, 371 U.S. 824, 83 S.Ct. 44, 9 L.Ed. 2d 64 (1962); Mennen Co. v. FTC, 288 F. 774, 782, 30 A.L.R. 1120 (2d Cir.), cert. denied, 262 U.S. 759, 43 S.Ct. 705, 67 L.Ed. 1219 (1923).

5. See note 3 *supra*.

hibited by Section 2(e). We find these rulings to be amply supported by the evidence of record, and we think the Commission quite properly rejected the defenses to the complaint put forward by Kaplan. See FTC v. Morton Salt Co., 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196 (1948); Moog Industries, Inc. v. FTC, 238 F.2d 43 (8th Cir. 1956), aff'd 355 U.S. 411, 78 S.Ct. 377, 2 L.Ed.2d 370 (1958).

The only matter that seems to us to present a substantial question is the scope of the cease and desist order by which the Commission sought to implement its decision on the merits. Kaplan argues that the order, which is set forth in the margin,[6] is both too vague and too broad. It complains that it is impossible to tell what conduct it is forbidden to engage in, as well as that the order purports to proscribe conduct which has never been adjudicated to be unlawful and which is quite unrelated to the violations the Commission found it had committed. As appears on its face, all three paragraphs of the order are couched in broad language which clearly goes beyond the specific violations found by the Commission. In justifying the breadth of the order, the Commission stated:

"We have found that respondent has violated Sections 2(a), (d) and (e) of the Clayton Act, as amended [by the Robinson-Patman Act], and to have violated these subsections in a variety of ways. The violations shown herein cover a long period of time and tend to show favored treatment towards certain large retail customers. In the circumstances, we believe that an order broad enough to prevent future violations through variations in the methods engaged in is fully justified."

To us the Commission further argues that the use of the language of the statute provides "more clarity and precision of meaning * * * than alternative language could be sure to have," since that language has acquired specific meaning through administrative and judicial interpretation. Moreover, it points out, if the occasion arises Kaplan can seek modification of the order, or, under the Commission's Rules of Practice, 16 C.F.R. § 3.26(b), "request advice from the Commission as to whether a proposed course of action, if pursued by it, will

6. "IT IS ORDERED that respondent Joseph A. Kaplan & Sons, Inc., a corporation, its officers, employees, assignees, and representatives, directly or through any corporate or other device, in or in connection with the sale of shower curtains, shower curtain sets, shower curtain accessories, and related products in commerce, as commerce is defined in the Clayton Act, as amended, forthwith cease and desist from:

"1. Discriminating, directly or indirectly, in the price of said products of like grade and quality by selling to any purchaser at net prices higher than the net prices charged to any other purchaser who, in fact, competes with the purchaser paying the higher price in the resale and distribution of respondent's products.

"2. Paying or contracting to pay, or granting or contracting to grant, or allowing, directly or indirectly, anything of value, including checks and credits, to or for the benefit of a customer as compensation or in consideration of any advertising or promotional services or facilities furnished by or through said customer in connection with the sale or offering for sale of respondent's products, unless such payments, credits, grants or allowances are available on proportionally equal terms to all other customers competing in the distribution of said products.

"3. Discriminating, directly or indirectly, among competing purchasers of its products by contracting to furnish, furnishing, or contributing to the furnishing of, to any of respondent's customers the service of accepting the return of its unsold products or any other service or facility connected with the handling, sale or offering for sale of said products, unless such service or facility is made available on proportionally equal terms to all customers competing with such favored customers in the sale of said products."

constitute compliance with such order." [7] This latter procedure has been referred to in the past by courts of appeals, including this one, in sustaining orders of the Commission against similar attacks. See, *e. g.*, Giant Food Inc. v. FTC, 116 U.S.App.D.C. 227, 237, 322 F.2d 977, 987 (1963), cert. dismissed, 376 U.S. 967, 84 S.Ct. 1121, 12 L.Ed.2d 82 (1964); Vanity Fair Paper Mills, Inc. v. FTC, 311 F.2d 480, 488 (2d Cir. 1962). Compare Colgate-Palmolive Co. v. FTC, 326 F.2d 517, 521 n. 12 (1st Cir. 1963).

The Commission, we recognize, has a wide discretion in formulating appropriate remedies to deal with violations of the antitrust laws. FTC v. Ruberoid Co., 343 U.S. 470, 473, 72 S.Ct. 800, 96 L.Ed. 1081 (1952); Jacob Siegel Co. v. FTC, 327 U.S. 608, 611, 66 S.Ct. 758, 90 L.Ed. 888 (1946). In the exercise of this discretion, the Commission can properly consider many factors, such as the frequency and duration of the violations, the business and competitive history of the respondent, including evidence of past violations, and the likelihood that the respondent knew, or should have known, that its conduct was unlawful. This enumeration is by no means exhaustive.[8] And in most cases the Commission's choice of remedy will be left undisturbed by the courts.

We think that Paragraphs 1 and 2 of the Commission's order are reasonably adapted to prevent repetition of the specific practices found to be unlawful, as well as their possible resumption in modified form. See FTC v. National Lead Co., 352 U.S. 419, 428–429, 77 S. Ct. 502, 1 L.Ed.2d 438 (1957). Kaplan violated Section 2(a) in two different ways, and Section 2(d) by two other means, one of which it apparently concedes to have been unlawful. Each of these violations tended to favor a single group of its customers, the large retail outlets, and in particular the owners of AMC. They continued for a significant period of time. In each instance, the language of the order is framed to reach only the specific conduct found to be unlawful and related variations calculated to achieve the same prohibited ends. Under these circumstances, we are not prepared to say that these paragraphs of the Commission's order are unreasonably broad.

Paragraph 3 of the order, in our view, stands upon a somewhat different footing. Kaplan was found to have violated Section 2(e) in only one way, *i. e.*, by permitting some customers to return merchandise for credit. As the trial examiner recognized, that section embraces an unusually broad range of prohibited services, and he therefore limited his proposed order to forbidding "the acceptance of return of merchandise * * * rather than covering the myriad services possible in a merchandising relationship." The Commission, however, amended his order by inserting the words

---

**7.** Section 3.26(b) of the Commission's Rules of Practice for Adjudicative Proceedings provides as follows:

"Any respondent subject to a Commission order may request advice from the Commission as to whether a proposed course of action, if pursued by it, will constitute compliance with such order. The request for advice should be submitted in writing to the Secretary of the Commission and should include full and complete information regarding the proposed course of action. On the basis of the facts submitted, as well as other information available to the Commission, the Commission will inform the respondent whether or not the proposed course of action, if pursued, would constitute compliance with its order."

**8.** The courts have referred to several other criteria, including, for example, the fact that the respondent's conduct had not previously been recognized to be a violation, R. H. Macy & Co. v. FTC, 326 F.2d 445 (2d Cir. 1964); Grand Union Co. v. FTC, 300 F.2d 92 (2d Cir. 1962); evidence that the respondent's violation did not amount to a "flagrant" flouting of the law, Swanee Paper Corp. v. FTC, 291 F.2d 833 (2d Cir. 1961), cert. denied, 368 U.S. 987, 82 S.Ct. 603, 7 L.Ed.2d 525 (1962); and the fact that the offending practices had been discontinued prior to the Commission's filing of a complaint, R. H. Macy & Co. v. FTC, *supra;* Country Tweeds, Inc. v. FTC, 326 F.2d 144 (2d Cir. 1964).

"or any other service or facility connected with the handling, sale or offering for sale of said products," thereby, in effect, proscribing all that the statute itself purports in general terms to forbid.[9] At the same time it left unchanged Paragraph 2 of the order which, though Kaplan had been found to have violated Section 2(d) in at least two ways, was limited to advertising and promotional allowances. Perhaps the difficulty of framing an order that would proscribe the violation actually found and still prevent achievement of the prohibited objective by related means caused the Commission to scrap the examiner's recommendation. In any event, we think that the Commission's version, on the facts shown by this record, is unnecessarily broad, and that the examiner's order should have been approved.

We are reminded that Kaplan is subject to heavy monetary penalties if it should later be found to have violated the terms of the Commission's final order. Recently the Supreme Court intimated strongly that the 1959 amendments to Section 11 of the Clayton Act, 73 Stat. 243 (1959), 15 U.S.C. § 21,[10] impose an additional responsibility upon the Commission in framing its orders. In the course of expressly disclaiming to hold that an order unsuccessfully challenged prior to 1959 would likewise withstand attack under the new amendments, the Court declared:

> "The severity of possible penalties prescribed by the amendments for violations of orders which have become final underlines the necessity for fashioning orders which are, at the outset, sufficiently clear and precise to avoid raising serious questions as to their meaning and application."

FTC v. Henry Broch & Co., 368 U.S. 360, 367–368, 82 S.Ct. 431, 436, 7 L.Ed.2d 353 (1962). Our task in reviewing Commission orders necessarily includes the responsibility of seeing that the Commission remains appropriately conscious of the Supreme Court's injunction.

Kaplan can, of course, seek to take advantage of the Commission's procedure for advising a respondent as to whether its proposed conduct violates the terms of its order. But this procedure might well prove a wholly inadequate means for clarifying language as broad as that contained in Paragraph 3. Kaplan will be then in the position of inquiring whether its proposals violate the Commission's order, not whether they violate the antitrust laws. If it should honestly and in good faith disagree with the Commission's interpretation and implement them

9. Section 2(e) of the Robinson-Patman Act provides:

> "It shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale, with or without processing, *by contracting to furnish* or *furnishing* or by *contributing to the furnishing of, any services or facilities connected with the* processing, *handling, sale, or offering for sale* of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms."

[Italics indicate language also appearing in Paragraph 3 of the Commission's order.]

10. Under the amendments, orders of the Commission become final upon the expiration of the time allowed for filing a petition for review, if no such petition is filed within that time, or upon entry of an order of enforcement by a court of appeals. Final orders are enforceable by an action, brought by the Commission, for "a civil penalty" of not more than $5,000 for each offense, and each day of failure to comply with the Commission's order constitutes a separate offense. See Jaffe, *The Judicial Enforcement of Administrative Orders*, 76 HARV.L.REV. 865, 926–928 (1963).

notwithstanding the Commission's disapproval, it risks incurring the substantial penalties for violation of a final order, not simply a proceeding before the Commission, accompanied by a full hearing and resulting, at worst, in an order to cease and desist. And if the Commission determines to pursue the matter, Kaplan will come before the contempt court with a record of having ignored the Commission's advice. In order to avoid this possibility, it may be impelled to forego altogether whatever advantages the procedure affords. All of these, of course, are problems that any convicted violator of the antitrust laws encounters. But when an order is as broad as Paragraph 3 of the Commission's order in this case, honest disagreements as to its scope and meaning will be considerably more frequent than otherwise might, or need, be the case. A respondent forced to operate thereunder must either expose his major business decisions to a Commission veto, or remain in the dark regarding their legal consequences, with the risk, in either event, of incurring the substantial penalties now provided for by statute.

The Commission's findings of fact and conclusions of law are sustained. Paragraphs 1 and 2 of its order are enforced as entered. Paragraph 3 of the order is modified to read as follows:

"3. Discriminating directly or indirectly among competing purchasers of its products by contracting to furnish, furnishing, or contributing to the furnishing of the service or facility of accepting the return of its unsold products to any purchaser of said products bought for resale, with or without processing, unless such service or facility is accorded on proportionally equal terms to all purchasers competing in the resale of said products."

and, as so modified, is enforced.

It is so ordered.