**BRUHN'S FREEZER MEATS OF CHICAGO, INC., d/b/a Beefland Freezer Meats, Bruhn's Freezer Meats of Alexandria, Inc., d/b/a Bruhn's Freezer Meats, Beefland Freezer Meats of Denver, Inc., d/b/a Beefland Freezer Meats (Formerly Bruhn's Freezer Meats of Denver, Inc.), Bruhn's Service Company, Inc., Earl Bruhn, Jr., and Robert Bruhn, Petitioners,**

v.

**UNITED STATES DEPARTMENT OF AGRICULTURE, Respondent.**

No. 20223.

United States Court of Appeals,
Eighth Circuit.

Feb. 23, 1971.

E. Riley Casey, Steven John Fellman, Washington, D. C., Charles A. Nye, Omaha, Neb., for petitioners; Counihan, Casey & Loomis, Washington, D. C., of counsel.

William D. Ruckelshaus, Asst. Atty. Gen., Morton Hollander, Daniel Joseph, Attys., Dept. of Justice, Washington, D. C., Raymond W. Fullerton, Atty., Dept. of Agriculture, Washington, D. C., for respondents.

Before MATTHES, Chief Judge, and LAY, Circuit Judge, and REGISTER, Chief District Judge.

MATTHES, Chief Judge.

This case is here on petition for review of a decision of the Judicial Officer of the United States Department of Agriculture, filed March 9, 1970, finding petitioners had engaged in practices that were in violation of § 202(a) of the Packers and Stockyards Act as amended 7 U.S.C. § 181 et seq.[1]

Petitioners do not challenge the findings of fact upon which the Judicial Officer premised his conclusion that peti-

1. Upon motion of the Secretary for a temporary injunction restraining violation of the administrative cease and desist order pending final determination of the petition for review, this court on May 28, 1970, issued an order temporarily enjoining petitioners from violating the cease and desist order "until the final determination of the petition for review."

tioners had violated the Act. They rely principally on legal issues for vacation of the decision of the Judicial Officer and for dismissal of the complaint. We nevertheless deem it appropriate to engage in a résumé of the proceedings and the pertinent facts as disclosed by the evidence and found by the Judicial Officer for the purpose of placing in proper perspective the questions we are required to resolve.

Petitioner Bruhn's Service Company, Inc., is a Nebraska corporation having its principal office and place of business at Elkhorn, Nebraska. It owns all the stock of petitioners Bruhn's Freezer Meats of Chicago, Inc., Bruhn's Freezer Meats of Alexandria, Inc., Beefland Freezer Meats of Denver, Inc., and each of 31 other corporations in the Bruhn organization.[2]

Petitioners Earl Bruhn, Jr. and Robert Bruhn, of Elkhorn, Nebraska, own 51% and 49%, respectively, of the stock of Bruhn's Service Company, Inc. They are president and vice president, respectively, of the four petitioning corporations and the other 31 corporations delineated in the complaint and findings.

In essence, the complaint alleged that the petitioners violated § 202(a) of the Act by (1) engaging in "bait and switch" tactics in connection with the sale of bulk quantities of meat; (2) misrepresenting United States Department of Agriculture (USDA) quality grades of meat; (3) misrepresenting the anticipated yield of bulk quantities of meat; (4) misrepresenting the part of the carcass from which meat was derived; and (5) failing to deliver the quality of meat a customer had specifically selected and purchased.

The lengthy complaint enumerated the number of unfair and deceptive practices and devices relied upon to prove violations of the Act. After the issues were joined by the filing of petitioners' answer, a series of legal maneuvers followed, including the issuance of a temporary restraining order against the Secretary by a judge of the United States District Court for the District of Columbia, who later dismissed petitioners' action and denied a temporary injunction. On appeal, the United States Court of Appeals for the District of Columbia denied a motion to stay the administrative proceedings and affirmed the action of the district court. Eventually, hearings commenced and eight separate sessions were conducted from October 1, 1966 through April 18, 1968.

On April 4, 1969, the hearing examiner filed his report containing 42 findings. We have examined the pertinent portions of the voluminous record and find ample support for the findings. As there is no assault upon the findings, we briefly paraphrase parts of the examiner's report, particularly the portion thereof dealing with the activities engaged in by the petitioners at different plants operated by them.

In 21 different transactions petitioners "baited" customers with extensive advertising of quarters, sides and other bulk quantities of meat at unrealistically low prices. When the prospective purchaser arrived at the plant, an employee of petitioner made a concerted effort to "switch" the customer to the purchase of a bulk quantity of expensive meat. In 13 of the 21 transactions, the efforts to switch were successful.

Petitioners caused customers to make the switch and purchase expensive meat in lieu of the sides and quarters that appeared inedible by purposefully preparing an unappetizing display of the inferior quality meat, representing it as the advertised product, and by discouraging the purchase of such product.

The corporate petitioners extensively advertised the sales of sides, quarters and other bulk quantities of meat at

2. The complaint and findings designate the other corporations which are not parties herein. Their identity is not in dispute, and accordingly we forego naming them. We have jurisdiction of this proceeding by virtue of 7 U.S.C. § 194, which provides that the petition for review shall be filed in the Court of Appeals for the Circuit in which the packer has his place of business. As noted, Bruhn's Service Company, Inc. has its principal place of business in Nebraska.

prices which were within the range of wholesale prices generally accepted in the meat packing industry for the advertised quantities and grades. These advertisements appeared in reputable newspapers having a multi-state circulation and caused numerous customers and prospective customers to cross state lines. In a number of instances, representations were made by petitioners' employees that bulk quantities of meat constituted a beef "hindquarter", whereas the meat that was delivered was not the quality the buyers had selected.

Petitioners' employees on occasion represented beef to be a specific USDA quality grade and in reliance on such representation, the customer purchased the beef, however, the product which was processed and delivered had not been USDA quality graded.

Upon the basis of his findings, the hearing examiner concluded that the petitioners had engaged in unfair or deceptive practices or devices in commerce in violation of § 202 of the Act, 7 U.S.C. § 192. The examiner recommended the issuance of a cease and desist order.

Upon request of petitioners, the cause was certified to the Judicial Officer who, in due time, filed his findings of fact, conclusions and order. The Judicial Officer made findings substantially coinciding with those of the hearing examiner.[3]

The petitioners present five contentions which, in essence are:

(1) the petitioners are not "packers" as that term is defined in the Act, 7 U.S.C. § 191;

(2) the acts and practices found by the Judicial Officer to be unfair or deceptive in violation of 7 U.S.C. § 192(a) were not in "commerce" as that term is defined in the Act, 7 U.S.C. § 182;

(3) the Department of Agriculture has no jurisdiction over petitioners' activities because they are retail activities

and excluded by the provisions of 7 U.S.C. § 227;

(4) the Judicial Officer's finding that the Department of Agriculture had jurisdiction pursuant to 7 U.S.C. § 227(a), when this basis of jurisdiction was not set forth in the complaint, violates petitioners' right to due process; and

(5) there is no substantial evidence in the record to support a finding that the individual petitioners controlled the activities of the corporate petitioners.

These contentions will be considered seriatim.

■ At the outset we note that the Packers and Stockyards Act is remedial legislation and should be liberally construed to further its life and fully effectuate its public purpose. Stafford v. Wallace, 258 U.S. 495, 521, 42 S.Ct. 397, 66 L.Ed. 735 (1922); Swift & Company v. United States, 393 F.2d 247, 253 (7th Cir. 1968); Bowman v. United States Department of Agriculture, 363 F.2d 81, 85 (5th Cir. 1966). Cf. Marriot v. National Mut. Cas. Co., 195 F.2d 462, 466 (10th Cir. 1952); Binkley Mining Co. of Missouri v. Wheeler, 133 F.2d 863, 871 (8th Cir.), cert. denied, 319 U.S. 764, 63 S.Ct. 1326, 87 L.Ed. 1715 (1943); Benas v. Maher, 128 F.2d 247, 252 (8th Cir. 1942).

I

Section 201 of the Act, 7 U.S.C. § 191, in pertinent part provides:

"The term 'packer' means any person engaged in the business (a) of buying livestock in commerce for purposes of slaughter, or (b) of manufacturing or preparing meats or meat food products for sale or shipment in commerce, or (c) * * *, or (d) of marketing meats, meat food products, * * * in commerce; but no person engaged in such business of manufacturing or preparing livestock products

---

3. The Judicial Officer issued a cease and desist order set forth at the conclusion of his reported opinion. *Bruhn's Freezer Meats of Chicago, Inc.*, 29 A.D. 223 (1970). Inasmuch as the provisions of the order are not in issue, we pretermit discussion thereof.

or in such marketing business shall be considered a packer unless—

(1) Such person is also engaged in any business referred to in clause (a) or (b) of this section * * *."

This definition of packer has remained intact since the Act was originally passed in 1921 even though it has been amended in other respects. Arkansas Valley Industries v. Freeman, 415 F.2d 713, 715 (8th Cir. 1969).

The petitioners have, from the outset, contended that their activities do not constitute "manufacturing or preparing meats or meat food products" within the 1921 definitional concept. They submit that Congress could not have considered the regulation of freezer plants within the purview of the Act as freezers did not exist as a market factor in 1921. They liken their operation to that of the corner butcher shop which was not regulated because of its retail nature.[4]

The record conclusively shows, in accordance with the findings of the Judicial Officer, that petitioners cut up sides and quarters of beef into consumer cuts, boned and ground meats, and then trimmed and wrapped the individual cuts and froze the prepared meat to preserve it. Bruhn's Freezer Meats of Chicago, Inc., 29 A.D. 223 (1970).

The term "preparing" is not defined in the Act and we find nothing in the legislative history of the Act which would require an interpretation limiting its application to wholesalers or slaughterers. Rather, the purpose of the Act is to assure fair trade practices in the livestock marketing and meat-packing industry in order to safeguard farmers and ranchers against receiving less than the true market value of their livestock and *"to protect consumers against unfair business practices in the marketing of meats * * *"* (emphasis added) and

---

4. The Federal Trade Commission and the Department of Agriculture have not been in accord as to the activities which must be found to bring a handler and seller of meat and meat food products within the statutory definition of "packer." Each has interpreted the terminology in the definition in a manner that would result in a finding of jurisdiction in the case before it. A comparison of the case of Renaire Corp. (Pennsylvania), 55 F.T.C. 1169 (1959) with First National Stores, Inc., 23 A.D. 1339 (1964) and Secretary of Agriculture v. Great Atlantic & Pacific Tea Co., B.A.I. Docket No. 476 (December 29, 1936) is indicative.

Renaire (Pennsylvania) was charged with having violated the F.T.C. Act, 15 U.S.C. § 41 et seq., by misrepresenting the benefits and advantages afforded by purchasing a complete line of frozen foods sold by them under a food purchase plan. Renaire purchased carcasses of meat from packing houses and processed it further by cutting, boning, grinding, and freezing the meat. The hearing examiner found that Renaire was a packer under the Packers and Stockyards Act, and therefore, the matters involved were not within the F.T.C.'s jurisdiction. 55 F.T.C. at 1190. In finding that the hearing examiner's conclusion that Renaire should be deemed a packer was erroneous, the Commission held that "the processing activities performed by persons not members of the slaughtering and meat packing in-

dustry which are similar to those customarily engaged in the furtherance of the retail merchandising of meat do not constitute the manufacture and preparation of meat and meat food products within the intent and meaning of the Packers and Stockyards Act." 55 F.T.C. at 1191.

The Judicial Officer, in *First National Stores, Inc.,* found that First National "corns beef; cures spareribs; smokes pork bellies for bacon; grinds beef, veal and pork and prepares it for sale as hamburger, frankfurters, sausage, * * * and other table-ready meat products." The Department of Agriculture was found to have jurisdiction because "[i]t has long been the administrative interpretation of the Department that the activities described [above] constitute the manufacturing and preparing of meat and meat food products * * *" 23 A.D. at 1345.

In *Great Atlantic & Pacific Tea Co.,* the respondent denied that it was engaged in the manufacture and preparation of meat and meat food products thereby raising the question of the Secretary's jurisdiction. The Secretary found that respondent purchased quarters of beef and pork slabs which they froze, cut into smaller pieces, boned, rolled, sliced and wrapped for shipment and that they therefore were engaged in the business of manufacturing and preparing meat and were packers. The Secretary thereby found that he had jurisdiction and authority to issue a cease and desist order.

the other products covered by the Act. H.R.Rep.No.1048, 85th Cong., 1st Sess. (1957), U.S.Code Cong. & Admin.News 1958, p. 5213. The House Committee on Agriculture, in recommending passage of the bill, states that the definition of "packer", 7 U.S.C. § 191, was constructed "[i]n order to bring within the terms of the bill the packer as thus defined, whatever the ramifications of his business and whatever the form of corporate organization * * *." H.R.Rep.No. 77, 67th Cong., 1st Sess. 3 (1921).

■ The principle is firmly established that in the interpretation of a statute its words are to be taken according to the meaning given in common usage, in the absence of an indication of a contrary intent or unless to do so would defeat the purpose for which the Act was passed. Crane v. Commissioner, 331 U. S. 1, 6, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947); Community Blood Bank of Kansas City Area v. F. T. C., 405 F.2d 1011, 1015 (8th Cir. 1969); Rice v. United States, 356 F.2d 709, 712 (8th Cir. 1966); Sternberg Dredging Co. v. Walling, 158 F.2d 678, 681 (8th Cir. 1946).

The word "prepare" is defined in Webster's New International Dictionary 1790 (1965) as follows: "to make ready beforehand for some purpose: put into condition for a particular use, application, or disposition," or "to make ready for eating." Black's Law Dictionary 1344 (Rev. 4th ed. 1968) defines prepare as "[t]o provide with necessary means; to make ready; to provide with what is appropriate or necessary." Additionally, in the more recently enacted Wholesome Meat Act, 21 U.S.C. § 601 et seq., amending the Federal Meat Inspection Act, the term "prepared" is defined in context of the meat industry to mean "slaughtered, canned, salted, rendered, boned, cut up, or otherwise manufactured or processed." 21 U.S.C. § 601(*l*). We note, however, that in the pre-enactment analysis of the Wholesome Meat Act, the Senate Agricultural and Forestry Committee stated, "[t]he term 'prepared' is not defined in the present act and cutting up or boning carcasses has, administratively not been classed as preparation of products requiring inspection." S.Rep.No. 799, 90th Cong., 1st Sess. (1967), U.S. Code Cong. & Admin.News 1967, p. 2194.

■ The construction of a statute as applied to a justiciable controversy is a legal function and judicial construction must prevail over a contrary administrative interpretation. United States v. American Trucking Ass'n, 310 U.S. 534, 544, 60 S.Ct. 1059, 84 L.Ed. 1345 (1939); Woods v. Benson Hotel Corp., 177 F.2d 543, 546 (8th Cir. 1949). See also Arkansas Valley Industries v. Freeman, supra 415 F.2d at 718; Land O'Lakes Creameries, Inc. v. Commodity Credit Corp., 265 F.2d 163, 165–166 (8th Cir. 1959). We therefore follow the judicial construction of the statute as found in Safeway Stores, Inc. v. Freeman, 125 U.S.App.D.C. 175, 369 F.2d 952 (1966).

In *Safeway*, appellants owned warehouses where they conducted carcass breaking, corning, incidental boning and trimming, and grinding of meat before distribution to their retail marketing facilities. The Court of Appeals, in affirming the district court's finding that appellants were packers, stated:

"They [appellants] point out, however, that these activities are such as are commonly performed in retail stores, and therefore, it is contended, they should not be considered part of the 'manufacturing or preparing' of meats or meat food products by one not otherwise a member of the packing industry, although the same activities are performed by those who admittedly are 'packers.' Appellants' position does not accord with the fair meaning of the language of Section 191 or with the statutory plan. * * * Appellants are within the language of Section 191(b), upon which the Secretary relies, and we find no reason to exclude them from its meaning." (footnote omitted)

*Id.* at 955. See Folsom-Third Street Meat Co. v. Freeman, 307 F.Supp. 222, 225 (N.D.Cal.1969).

■ We have demonstrated the existence of an essential element of packer status, i. e., that petitioners engaged in manufacturing or preparing meats or meat food products within the meaning of § 201 of the Act, 7 U.S.C. § 191. An additional element must be proved however, in order to satisfy the definition of the term "packer," namely that petitioners' manufacturing or processing activities were performed on meats or meat food products "for sale or shipment in commerce." Petitioners claim that even if it be determined that they prepare meats, there was no sale or shipment in commerce because they purchased carcasses at a price based on the weight when delivered to the plant and sold only to consumers at the site of their plant. Furthermore, petitioners contend that the sales to consumers were not regulated sales because the flow of commerce under the Packers and Stockyards Act ended when the meat was sold to a retailer. We find no support for these contentions.

"Commerce" is defined in the Act, 7 U.S.C. § 182, to mean "commerce between any State, Territory, or possession, or the District of Columbia, and any place outside thereof * * *." Additionally, Section 183 provides that "[f]or the purpose of this chapter (but not in anywise limiting the definition in section 182 of this title) a transaction in respect to any article shall be considered to be in commerce if such article is part of that current of commerce usual in the livestock and meat-packing industries, whereby livestock, meats, meat food products, * * * are sent from one State with the expectation that they will end their transit, after purchase, in another * * *."

■■ The Act was framed in language designed to permit the fullest control of packers and stockyards which the Constitution permits, and its coverage was to encompass the complete chain of commerce and give the Secretary of Agriculture complete regulatory power over packers and all activities connected therewith. H.R.Rep.No.324, 67th Cong., 1st Sess. (1921); H.R.Rep.No.77, 67th Cong., 1st Sess. (1921). The provisions of the Act, declaring unfair and unjust deceptive practices to be unlawful, were predicated on the theory that the business of the packer per se is that which flows from one part of the country to another from the producer of the livestock to the consumer of the meat products. Trunz Pork Stores v. Wallace, 70 F.2d 688, 689 (2d Cir. 1934). It is apparent, therefore, that in order to fully effectuate its purposes, the sale of meats and meat food products to the consumer must be included within the ambit of the Act.

■ It is settled doctrine that where one purchases goods in one state for transportation to another, the interstate commerce transaction includes the purchase as well as the transportation. United States v. Rock Royal Co-op., 307 U.S. 533, 568–569, 59 S.Ct. 993, 83 L.Ed. 1446 (1938); Dahnke-Walker Milling Co. v. Bondurant, 257 U.S. 282, 290–292, 42 S.Ct. 106, 66 L.Ed. 239 (1921); Swift & Co. v. United States, 196 U.S. 375, 398–399, 25 S.Ct. 276, 49 L.Ed. 518 (1904); United States v. Sanders, 196 F.2d 895, 898 (10th Cir.), cert. denied, 344 U.S. 829, 43 S.Ct. 33, 97 L.Ed. 645 (1952); Northwestern Improvement Co. v. Ickes, 111 F.2d 221, 223 (8th Cir. 1940). If the transportation was incidental to the buying or selling, it is immaterial whether the transportation takes place before or after the sale or whether delivery for transportation is made to a common carrier, private carrier, or to the purchaser for transportation himself. N.L.R.B. v. Fainblatt, 306 U.S. 601, 605, 59 S.Ct. 668, 83 L.Ed. 1014 (1938); Dahnke-Walker Milling Co. v. Bondurant, supra 257 U.S. at 291, 42 S.Ct. 106; United States v. Simpson, 252 U.S. 465, 466–467, 40 S.Ct. 364, 64 L.Ed. 665 (1920); United States v. Sanders, supra. See also Gordon v. Paducah Ice Mfg. Co., 41 F.Supp. 980, 985 (W.D.Ky.1941).

■ From the foregoing decisions, it is clear that when the petitioners sold meat and delivered it to the purchaser at

their plant, and it was understood by both the petitioners and the purchaser that the purchaser was going to promptly transport the meat across state lines, the sale was itself part of interstate commerce. We find that petitioners were packers within the intent and meaning of the Act in that they manufactured or prepared meats or meat food products for sale or shipment in commerce.

## II

■ Petitioners also urge that the deceptive acts and practices found by the Judicial Officer to have been in violation of § 202(a) of the Act, 7 U.S.C. § 192(a), were not *in commerce*. We disagree. We have determined that the petitioners were packers which necessarily includes engaging in commerce. It is axiomatic, therefore, that the acts and practices of the petitioners in the advertising, preparing and selling of the meat were in commerce. Capitol Packing Co. v. United States, 350 F.2d 67, 81 (10th Cir. 1965); Wilson & Co. v. Benson, 286 F.2d 891, 892 (7th Cir. 1961); Swift & Co. v. Wallace, 105 F.2d 848, 861 (7th Cir. 1939); Trunz Pork Stores v. Wallace, supra 70 F.2d at 689; Folsom-Third Street Meat Co. v. Freeman, supra. See Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942); Stafford v. Wallace, supra; Swift & Co. v. United States, supra 196 U.S. at 398–399, 25 S.Ct. 276.

## III

The petitioners contend that the Secretary does not have jurisdiction over their activities because they are exclusively retailers, not wholesalers. Conversely, the Secretary submits that bulk sales by the petitioners, even though to consumers, are not "retail sales" within the meaning of the Act. The resolution of the issue depends upon the interpretation of the 1957 amendment to § 406 of the Act, 7 U.S.C. § 227.

Under the provisions of the Act as enacted in 1921, any person or firm engaged in the business of marketing meats or food products in interstate commerce, even at retail, was subject to the provisions of the Act if that person or firm also owned 20% of the interest in a meatpacking or processing plant. However, in the following 30 years, the area in which the Act was designed to operate had so substantially changed that the Secretary of Agriculture became charged with regulation of large chain stores which sold, in addition to meat, canned foods, fresh vegetables, drugs, notions, kitchen articles, and a wide variety of other merchandise. Therefore, to make the Act once again an effective instrumentality for the regulation of the meatpacking industry and for the protection of both the producers and consumers, Congress amended § 406 of the Act.

Pursuant to that amendment, there is a clear delineation, with respect to jurisdiction over *meatpackers*, between the Secretary of Agriculture and the Federal Trade Commission. For the purposes of this case, which involves only meat and meat food products, it will suffice to note that the Secretary retained jurisdiction over and responsibility for those *activities of packers relating to meat and meat food products*. Other activities of packers previously subject to jurisdiction of the Secretary were placed under the jurisdiction of the F.T.C. Chain stores and other firms engaged only incidentally in meat packing or processing were made subject to the Packers and Stockyards Act only to the extent that they were engaged in meatpacking or some other operation falling within the specific responsibility of the Secretary. H.R.Rep.No.1048, supra.

Section 406(b) of the Act, as amended, placed *primary* jurisdiction over and responsibility for all packer activities relating to meat and meat food products in the Secretary except that *primary* jurisdiction over and responsibility for the "retail sales" of these goods was placed in the F.T.C. However, the Secretary may exercise jurisdiction over the "retail sales" of meat or meat food products

pursuant to § 406(d) which provides in pertinent part:

"The Secretary of Agriculture shall exercise power or jurisdiction over * * * *retail sales* of meat, meat food products, * * * only when he determines, in any investigation of, or any proceeding for the prevention of, an alleged violation of this chapter, that such action is necessary to avoid impairment of his power or jurisdiction over acts or transactions involving * * * meat, meat food products, * * * other than retail sales thereof." (Emphasis added)

The term "retail sales" is undefined in the Act but the legislative history defines it to mean "sales by a retailer to an individual consumer—not bulk sales to institutions and bulk users of products as are normally made by wholesale dealers." H.R.Rep.No.1048, U.S.Code Cong. & Admin.News 1958, p. 5218, supra.

The Judicial Officer, concluding that the Secretary had acted within his jurisdiction as conferred by the Act, held that petitioners were not engaged in "retail sales" because in light of the problems which the amendment was intended to correct,

"it is evident that the Committee [on Agriculture] was thinking in terms of retail merchandising of meat by chain grocery stores qualifying as packers under the act who retail meat along with numerous other food and non-food lines. It is seen too that the Committee did not mean by 'retail sales' the kind of activity normally performed by wholesalers.

Respondents' [petitioners herein] operations are not those of the normal and usual retailer of meat as described in the House Report above [H. R.Rep.No.1048]. *They process and sell meat exclusively. They sell in bulk quantities and in the wholesale price range.* We do not think that their sales of meat are the kind of retail sales that Congress intended to cover by the language of section 406(b) (3) [7 U.S.C. § 227(a) (3)]."

*Bruhn's Freezer Meats of Chicago,* supra. Additionally, he concluded that even if he had been in error in finding petitioners to be packers and if they were engaged in "retail sales" the Secretary would still have jurisdiction pursuant to § 406(d), 7 U.S.C. § 227(c), because he had determined that the deceptive practices would impair his jurisdiction over other acts or transactions involving meat or meat food products.

█ Without passing upon the rationale of the Judicial Officer's findings and conclusions, we are convinced that the Secretary had jurisdiction because as shown above, the petitioners were packers. Section 406(d) clearly affords the Secretary a basis for jurisdiction over the petitioners' activities even if the sales are, as the petitioners contend, retail sales. The evidence is sufficient to show that petitioners misrepresented the USDA grade of meat sold to their customers. The record shows that the National Provisional Daily (Yellow Sheet) Market and News Service, an industry-wide publication, utilizes USDA grading to establish wholesale meat prices in the industry. As we have seen, the petitioners also engaged in switching the quality and weights of meat delivered to their customers. These practices, if allowed to continue, would undermine public confidence in the meat industry generally and undermine the orderly market practices, the maintenance of which is the Secretary's responsibility. 7 U.S.C. § 1622(h).

Section 406(d) provides that if the Secretary determines, in an investigation of alleged violations of the Packers and Stockyards Act, that it is necessary to assume jurisdiction over retail sales, he must notify the F.T.C. of such determination, the reasons therefor, and the acts or transactions involved. If the F.T.C. does not notify the Secretary within 10 days that there is pending before the Commission an investigation of, or proceeding for the prevention of, an alleged violation of the Act administered by the Commission involving the same subject matter, the Secretary may

proceed. The Secretary complied with the letter of the statute by notifying the F.T.C. in a letter of May 3, 1965 that "[t]he investigation of [petitioners] reveals various unfair and deceptive practices such as; short weights, misrepresenting grades and cuts of meat, and deceptive advertising in the selling of meat to customers," which practices "impair the U. S. Department of Agriculture's Meat Grading Service and the free competitive marketing of meat." The F.T.C. replied that it did not have pending any proceeding or investigation involving petitioners.

By the plain language of § 406(d) above referred to, Congress intended to avoid unnecessary duplication of effort by the Government and burdens upon the meat packing industry. Such a reading of the statute is supported by the legislative history. In that part of H.R. 1048, supra, subtitled "Analysis of the Bill—*Jurisdiction over packers*," the following pertinent statement appears.

> "Paragraph (2) of section 1 [now 7 U.S.C. § 227] provides that the Secretary of Agriculture and the Federal Trade Commission shall both have jurisdiction over trade practices at the retail sales level."

We hold against the petitioners on this issue and conclude that on this record the Secretary's jurisdiction pursuant to the Packers and Stockyards Act included Bruhn's retail sales activities.

### IV

The "Amended Complaint and Notice of Hearing" filed by the Department of Agriculture, charged that the petitioners had "engaged in and used unfair and deceptive practices and devices in commerce, in violation of Section 202(a) of the Act (7 U.S.C. § 192(a))." The petitioners contend that as the charge failed to apprise them that the Secretary intended to rely upon Section 406(d) as the basis of jurisdiction in the case, they were denied due process "in violation of their Constitutional rights."

Granted that the Amended Complaint did not allege that the Secretary was relying upon Section 406(d) as a basis for jurisdiction, we nevertheless find no substantial prejudice flowing from such omission. The record supports the conclusion that the petitioners were fully cognizant of the provisions of Section 406 as they asserted as an affirmative defense that "Section 406 [7 U.S.C. § 227] of the Packers and Stockyards Act, 1921; as amended specifically provides that the Department of Agriculture does not have jurisdiction over the retail transactions alleged to have occurred in the Department of Agriculture [sic] amended complaint under the circumstances involved herein."

Moreover, petitioners were aware of the substance of the Secretary's findings as outlined in the letter to the F.T.C., written pursuant to the requirement of Section 406. It is also significant that the relevance of Section 406 as a basis for jurisdiction was briefed by petitioners before the decision of the hearing examiner was filed, and the Secretary dealt with the question in his reply brief.

All this leads us to believe that the issue was in fact a live one and consequently the Judicial Officer was justified in relying upon that section as an alternative basis for jurisdiction. We find no rational basis for concluding petitioners were prejudiced, and certainly petitioners were not denied due process. Morgan v. United States, 304 U.S. 1, 18–19, 58 S.Ct. 773, 82 L.Ed. 1129 (1937); Swift & Co. v. United States, supra 393 F.2d at 252; Cella v. United States, 208 F.2d 783 (7th Cir. 1953), cert. denied, 347 U.S. 1016, 74 S.Ct. 864, 98 L.Ed. 1138 (1954); Jones Truck Lines v. United States, 146 F.Supp. 697, 701 (W.D.Ark.1956).

### V

Finally, petitioners contend that the record fails to show that the individual petitioners, Robert and Earl Bruhn, controlled and directed the acts and practices of the corporate petitioners, and consequently it is argued that the Judi-

cial Officer's cease and desist order should be vacated with regard to them. We find no merit in these claims.

The individual petitioners, as sole owners of all the stock of Bruhn's Service Company, which in turn, owned all of the stock of the other corporate petitioners, and as the president and vice-president of each of the corporate petitioners, had responsibility for the management, direction and control of the activities of the corporations. The Judicial Officer was, under the circumstances, justified in issuing the cease and desist order against the individual petitioners as well as against the corporations. Wilson v. United States, 221 U.S. 361, 376, 31 S.Ct. 538, 55 L.Ed. 771 (1910); Guziak v. F. T. C., 361 F.2d 700 (8th Cir. 1966), cert. denied, 385 U.S. 1007, 87 S.Ct. 712, 17 L.Ed.2d 545 (1967); Doyle v. F. T. C., 356 F.2d 381 (5th Cir. 1966); Barry v. Legler, 39 F. 2d 297 (8th Cir. 1930). Cf. F. T. C. v. Standard Education Society, 302 U.S. 112, 58 S.Ct. 113, 82 L.Ed. 141 (1937); Benrus Watch Co., Inc. v. F. T. C., 352 F.2d 313 (8th Cir. 1965), cert. denied, 384 U.S. 939, 86 S.Ct. 1457, 16 L.Ed.2d 538 (1966).

Clearly, an order limited in its application only to the corporate petitioners probably would prove futile as the corporations could be dissolved and the individual petitioners could then, under the cloak of new corporations, engage in the proscribed activities and thereby frustrate the purposes of the Act. The law is well settled that the "corporate entity may be disregarded when the failure to do so would enable the corporate device to be used to circumvent a statute." Schenley Distillers Corp. v. United States, 326 U.S. 432, 437, 66 S.Ct. 247, 90 L.Ed. 181 (1945); United States v. Lehigh Valley R. R., 220 U.S. 257, 259, 31 S.Ct. 387, 55 L.Ed. 458 (1911); Kavanaugh v. Ford Motor Co., 353 F.2d 710, 717 (7th Cir. 1965); Joseph A. Kaplan & Sons, Inc. v. F. T. C., 121 U.S.App.D.C. 1, 347 F.2d 785, 787 n. 4 (1965). See also 1 W. Fletcher,

Cyclopedia of the Law of Private Corporations § 45 (1963). Manipulation of corporations was considered by Congress at the time of the enactment of the Packers and Stockyards Act and the bill was passed in light of the conviction that skillful manipulation of corporate organizations should not result in evasion of the Act. H.R.Rep.No. 77, supra.

The order of the Judicial Officer is affirmed.

