369 F.2d 952
 SAFEWAY STORES, INC., Appellant,
v.
Orville FREEMAN, Secretary of Agriculture, Appellee.
The GREAT ATLANTIC & PACIFIC TEA COMPANY, Inc., Appellant,
v.
Orville L. FREEMAN, Secretary of Agriculture, Appellee.
 No. 19859.
 No. 19860.
 United States Court of Appeals District of Columbia Circuit.
 Argued May 26, 1966.
 Decided October 6, 1966.
 
 Mr. Arthur B. Hanson, Washington, D. C., with whom Mr. W. Frank Stickle, Jr., Washington, D. C., was on the brief, for appellant in No. 19859.
 Mr. Denis G. McInerney, Washington, D. C., with whom Mr. Donald J. Mulvihill, Washington, D. C., was on the brief, for appellant in No. 19860.
 Mr. Edward Berlin, Atty., Dept. of Justice, with whom John W. Douglas, Asst. Atty. Gen., Messrs. David G. Bress, U. S. Atty., and Morton Hollander, Atty., Dept. of Justice, were on the brief, for appellee.
 Messrs. James McI. Henderson, Gen. Counsel, and Harold D. Rhynedance, Jr., Atty., F. T. C., filed brief for amicus curiae Federal Trade Commission.
 Before BAZELON, Chief Judge, and FAHY and BURGER, Circuit Judges.
 FAHY, Circuit Judge.
 
 
 1
 Appellants, Safeway Stores, Incorporated, hereinafter Safeway, and the Great Atlantic & Pacific Tea Company, Inc., hereinafter A & P, brought actions under 28 U.S.C. §§ 2201-2202 (1964) for declaratory judgments and restraining orders against the Secretary of Agriculture,[1] appellee, to void the determination of the Secretary that within the meaning of the Packers and Stockyards Act, 1921,[2] Safeway and A & P are "packers."[3] Appellants also sought to restrain the Secretary from enforcing against them a regulation under the Act requiring an annual report from a "packer."[4] On cross motions for summary judgment the District Court granted the motions of the Secretary and denied those of appellants. Safeway Stores, Inc. v. Freeman, 244 F.Supp. 779. Their appeals from the ensuing orders of the District Court have been consolidated in this court.
 
 
 2
 Appellants are nationwide businesses with numerous retail stores through which they sell to local consumers groceries, produce, meat, meat products, and many other items. They also, as will more fully appear, maintain centralized facilities through which a significant part of the meat sold by them at retail passes and is processed. The position of the Secretary is that these facilities maintained and operated by these supermarket chains place them, with respect to the processing activities there, within the definition and meaning of "packers" as the term is used in the Act. We agree, and therefore affirm.
 
 
 3
 A "packer" is defined in the Act, 7 U.S.C. § 191 (1964), as follows:
 
 
 4
 The term "packer" means any person engaged in the business (a) of buying livestock in commerce for purposes of slaughter, or (b) of manufacturing or preparing meats or meat products for sale or shipment in commerce, or (c) of manufacturing or preparing livestock products for sale or shipment in commerce, or (d) of marketing meats, meat food products, livestock products, dairy products, poultry, poultry products, or eggs, in commerce; but no person engaged in such business of manufacturing or preparing livestock products or in such marketing business shall be considered a packer unless —
 
 
 5
 (1) Such person is also engaged in any business referred to in clause (a) or (b) of this section * * *
 
 
 6
 The Secretary found that each appellant is a "* * * person engaged in the business * * * of manufacturing or preparing meats or meat food products for sale or shipment in commerce * * *", activities which take place at their centrally located facilities or warehouses. The facts are, using now the year 1961 as illustrative: A & P had no less than twenty of these facilities throughout the United States, and Safeway had eight meat warehouses, two meat depots, and three meat plants. At its facilities A & P conducted carcass-breaking (with incidental boning and trimming) on approximately 250 million pounds of meat, corned 4 million pounds of beef, made 1 million pounds of meat sandwich spread, and sliced and wrapped 118 million pounds of meat and meat food products. Safeway broke at least 288 million pounds of carcasses, ground and sliced 81 million pounds of meat, corned at least 4 million pounds of beef and made 39 million pounds of luncheon meats and sausage.[5] Appellants conduct these activities at the facilities referred to in order to achieve greater economy and quality in their over-all operations.
 
 
 7
 They point out, however, that these activities are such as are commonly performed in retail stores, and therefore, it is contended, they should not be considered part of the "manufacturing or preparing" of meats or meat food products by one not otherwise a member of the packing industry, although the same activities are performed by those who admittedly are "packers." Appellants' position[6] does not accord with the fair meaning of the language of Section 191 or with the statutory plan. Section 191 sets out two mutually independent fields of activity,[7] (a) or (b), and a third and fourth, (c) or (d), which depend on the existence of a relation with an (a) or (b) function. It is reasonable for the Secretary to construe the Act to mean that by engaging in either of these activities without the other a concern is brought within the "packer" definition. Appellants are within the language of Section 191(b), upon which the Secretary relies, and we find no reason to exclude them from its meaning.
 
 
 8
 Appellants also contend, however, that even if the activities referred to would otherwise constitute them "packers" they escape the coverage of the Act since these activities on their part are not "in commerce" within the meaning of the requirements of Section 183 of the Act. That section reads in pertinent part:
 
 
 9
 § 183 When transaction deemed in commerce; "State" defined.
 
 
 10
 For the purpose of this chapter (but not in anywise limiting the definition in section 182 of this title) a transaction in respect to any article shall be considered to be in commerce if such article is part of that current of commerce usual in the livestock and meat-packing industries, whereby livestock, meats, meat food products, livestock products, dairy products, poultry, poultry products, or eggs, are sent from one State with the expectation that they will end their transit, after purchase, in another * * *
 
 
 11
 Appellants read Section 183 too narrowly. They would limit "in commerce" to include only transactions accompanied by the expectation that the articles involved "will end their transit, after purchase, in another" State, pointing out that the products they process at their central facilities end transit at their retail stores before being purchased by another. Section 183, enacted in 1921, had the purpose of making certain that such transactions as are therein particularly described would be covered, but Section 183 incorporates the definition of "commerce" in Section 182,[8] which does not have the language of Section 183 upon which appellants rely. The Act does not attempt to define all the different ways in which packers function between the farmer or grower and the retail store. In the passage of time there has evolved a partial vertical integration of the meat marketing structure, eliminating, as in these large chain store operations, a "sale" between a centralized preparation process and delivery to the retail store. But this does not avoid the jurisdiction of the Secretary. See Section 182, supra note 8. Further, this variation in the economic structure of the industry is specifically encompassed in the definition of packer: * * * `packer' means any person engaged in the business * * * of manufacturing or preparing meats or meat food products for sale or shipment in commerce * * *" 7 U.S.C. § 191 (b) (1964).[9] We cannot accept appellants' argument that the Act is meant to apply only to one who occupies a position in the marketing structure comparable to that the "Big Five" occupied in 1921 when the Act became law.[10] Congress did not direct its legislation only to those particular concerns whose activities gave rise to the legislation, but to all who would engage in the activities spelled out in the Act.
 
 
 12
 Appellants would divide the industry into artificial compartments. They urge that since the packing functions attributed to them are performed at both the wholesale and retail levels, and appellants are basically retail organizations, and no sale occurs in the transfer of the processed goods to the retail outlets, they should not be considered "packers" within the meaning of the Act. This creates a mutual exclusivity between a wholesaler and a retailer and ignores the purpose of the Act, to prevent economic harm to the "growers" and the "consumers"[11] through the concentration in a few hands of the economic function of the middle man.[12]
 
 
 13
 We come now to appellants' contention that the Secretary's application of the Act to them is inconsistent with the proper allocation of jurisdiction between the Federal Trade Commission and the Secretary.[13] Originally there was even a question whether the Federal Trade Commission, under the statutes administered and enforced by it, had jurisdiction over activities unrelated to packing when a firm also came within the Act's definition of a packer. This question grew out of the language of Section 406 (b) of the 1921 Act,[14] as follows:
 
 
 14
 * * * so long as [this chapter] remains in effect, the Federal Trade Commission shall have no power or jurisdiction so far as relating to any matter which by this Act is made subject to the jurisdiction of the Secretary * * * except when the Secretary of Agriculture, in the exercise of his duties hereunder, shall request of the said Federal Trade Commission that it make investigations and report in any case.
 
 
 15
 The 1958 Amendments to the Act cleared up this matter.[15] Those amendments carried forward two intentions of Congress, one that appellants were indeed to be considered "packers," notwithstanding they engage in many nonpacking activities, the other that in these latter activities they were subject to the jurisdiction of the Federal Trade Commission. As to the first intention, "a series of national food chains," in the language of Senator O'Mahoney,[16] and these appellants by name, among others, in the testimony of the then Chairman of the Trade Commission,[17] were said to qualify as "packers,"
 
 
 16
 although they are essentially engaged in merchandizing all of the thousands of items, usually found in grocery stores and supermarkets * * *
 
 
 17
 The original 1921 definition of "packer" was left intact by the Amendments, but Section 202, which made it unlawful for any packer to engage in the unfair, unjustly discriminatory, or deceptive practices there enumerated, was amended to limit such practices of "packers" subject to the jurisdiction of the Secretary to those "with respect to livestock, meats, meat food products, livestock products in unmanufactured form, poultry, or poultry products."[18] Thus any claim of general jurisdiction in the Secretary over the strictly retail operations of concerns like appellants, notwithstanding a part of their operations caused them to be packers, was eliminated.
 
 
 18
 The same division of jurisdiction appears in the 1958 changes in Section 406(b).[19] The Trade Commission no longer would have "no power or jurisdiction" relating to any matter the subject of the Secretary's jurisdiction except at the latter's request. Thereafter the Commission would have jurisdiction also over matters otherwise within the jurisdiction of the Secretary "if the Commission determines that effective exercise of its power or jurisdiction with respect to retail sales of any such commodities is or will be impaired by the absence of power or jurisdiction over all acts or transactions involving such commodities." The commodities referred to were "meat, meat food products, livestock products in unmanufactured form, or poultry products." The Commission also was given jurisdiction of transactions in commerce involving retail sales of these articles. Except as above indicated, the Amendments provide that the Commission shall have no jurisdiction over any matter which by the Act is made subject to the jurisdiction of the Secretary.[20]
 
 
 19
 By the foregoing and complementary provisions, it appears quite clear that Congress understood that appellants and comparable concerns had brought themselves in the course of time and by reason of the nature of their operations within the definition of "packer" in the Packers and Stockyards Act, that they became subject to the jurisdiction of the Secretary in those operations, and that their activities in other respects, and as provided in the 1958 Amendments, should not be excluded from the jurisdiction of the Federal Trade Commission. The consequence is that appellants' argument based on the undesirability of a division or sharing of jurisdiction between the Secretary and the Trade Commission may not be accepted by the court. It is for Congress to consider should it desire to do so.
 
 
 20
 Appellants place some reliance upon a statement in Giant Food Inc. v. Federal Trade Commission, 113 U.S.App. D.C. 227, 230, 307 F.2d 184, 187, that we found without merit Giant's contention that it was a "packer" within the meaning of the Packers and Stockyards Act. Viewed in context, the statement is not inconsistent with our present decision. The case involved proceedings against Giant by the Federal Trade Commission for unfair trade practices in the conduct of its retail business as such. The court was not called upon to and did not consider whether in some of its operations Giant would qualify as a "packer" and, in those operations, be subject to the Packers and Stockyards Act as administered by the Secretary of Agriculture.
 
 
 21
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 The District Court had jurisdiction. The actions arose under an act of Congress designed to protect trade and commerce from restraint and monopoly. 28 U.S.C. § 1337 (1964)
 
 
 [2]
 42 Stat. 159 (1921), as amended, 7 U.S.C. §§ 181-229 (1964)
 
 
 [3]
 See 7 U.S.C. § 191 (1964) set outinfra.
 
 
 [4]
 9 C.F.R. § 201.97 (1966). The penalty provisions of 15 U.S.C. § 50 (1964) are made applicable through 7 U.S.C. § 222 (1964)
 
 
 [5]
 The figures on the amount of meat processed by Safeway in pounds per year at its central facilities are approximations since Safeway did not provide the relevant data directly
 
 
 [6]
 Appellants overlook the fact that strict retail activities do not involve "shipment in commerce" after processing
 
 
 [7]
 The disjunctive "or" signifies alternatives
 
 
 [8]
 Section 182, in pertinent part reads:
 (6) The term "commerce" means commerce between any State, Territory, or possession, or the District of Columbia, and any place outside thereof; or between points within the same State, Territory or possession, or the District of Columbia, but through any place outside thereof; or within any Territory or possession, or the District of Columbia.
 
 
 [9]
 The FTC reported that some traditional packers also had retail outlets but that this was not considered significant, nor was there a tendency to develop in that direction. FTC,Report on the Meat-Packing Industry, pt. IV, at 43.
 
 
 [10]
 See generally FTC,Report on the Meat-Packing Industry (1919); Hearings Before the House Committee on Agriculture on the Meat Packer Legislation, 66th Cong.2d Sess. (1920); Legislation, 22 Colum.L.Rev. 68 (1922).
 
 
 [11]
 FTC, op. cit. supra note 10, pt. I at 79
 
 
 [12]
 In 1921 there were no large combinations of retail stores. The middle man, the "packer," controlled the full range of services between the rancher and the local level. Dealing in fantastic volume and being few in number, the "Big Five" exerted tremendous influence on the meat market. The 1921 law was enacted to prevent harm to the rancher and the consumer through an abuse of this position
 Since then the structure of the industry has changed to the point where appellants' two retail chain store corporations alone buy for 6,684 stores doing over $8,033,893,421 of business a year. This has shifted the balance of market power so that they have absorbed part of the preparation and manufacturing function, for reasons of economy and efficiency, that the "Big Five" formerly performed.
 
 
 [13]
 At the invitation of this court, the Federal Trade Commission filed a brief asamicus curiae to which the parties were given an opportunity to reply. The Commission did not take a position on the finding that appellants are "packers" but urged that an affirmance of that finding would in no way hamper the Commission in the exercise of its jurisdiction.
 
 
 [14]
 Packers and Stockyards Act, 1921, ch. 64, § 406(b), 42 Stat. 169
 
 
 [15]
 Act of September 2, 1958, ch. 909, 72 Stat. 1749
 
 
 [16]
 Hearings Before the Subcommittee on Antitrust and Monopoly of the Senante Committee on the Judiciary pursuant to S.Res. 57 on S. 1356, 85th Cong., 1st Sess. 4 (1957).
 
 
 [17]
 Id., at 34.
 
 
 [18]
 Act of September 2, 1958, ch. 909, § 1(1), 72 Stat. 1749
 
 
 [19]
 Act of September 2, 1958, ch. 909 § 1(2), 72 Stat. 1749
 
 
 [20]
 Act of September 2, 1958, ch. 909, § 1(2) (c), 72 Stat. 1750