786 F.2d 751
 D & W FOOD CENTERS, INC., Plaintiff-Appellee,
v.
John R. BLOCK, individually and in his capacity as Secretary
of the United States Department of Agriculture,
and the United States of America,
Defendants- Appellants.
 No. 85-1095.
 United States Court of Appeals,
Sixth Circuit.
 Argued Dec. 3, 1985.
Decided March 27, 1986.
 
 Julie Ann Woods, Asst. U.S. Atty., James Michael Kelly (argued), Grand Rapids, Mich., Virginia Strasser, U.S. Dept. of Agriculture, Office of the General Counsel, Washington, D.C., for defendants-appellants.
 Leonard M. Hoffius, Douglas W. VanEssen (argued), Grand Rapids, Mich., for plaintiff-appellee.
 James M. Goldberg, Richard L. Frank, Dennis R. Johnson, Washington, D.C., for amicus.
 Before KENNEDY and KRUPANSKY, Circuit Judges; and BROWN, Senior Circuit Judge.
 BAILEY BROWN, Senior Circuit Judge.
 
 
 1
 Plaintiff-appellee D & W Food Centers, Inc. (D & W) filed this action in the federal district court for the Western District of Michigan. On the basis of briefs and stipulated facts, the district court issued a declaration that D & W's pizza-making operation was not covered by the continuous inspection provision of the Federal Meat Inspection Act, 21 U.S.C. Sec. 606 (1982) (FMIA), and an injunction prohibiting defendants-appellants John R. Block, Secretary of Agriculture (the Secretary), and the United States Department of Agriculture (USDA) from enforcing that provision against D & W. We conclude that the district court correctly determined that D & W may not, under the circumstances, be treated as a "packing ... or similar establishment" subject to that provision of the FMIA, and accordingly affirm the judgment of the district court.
 
 
 2
 * D & W is a Michigan corporation, owning and operating a chain of thirteen retail grocery stores in the Grand Rapids area. The business operates entirely in intra state commerce; however, if the requirements of this regulatory statute are otherwise met, the pizzas sold would be treated as "prepared for commerce," 21 U.S.C. Sec. 606, and the preparation facility would be subject to USDA inspection, because Michigan is a "designated" state, i.e., a state designated by the Secretary for continuous federal inspection for lack of an adequate state inspection apparatus. See 21 U.S.C. Sec. 661(c)(1) (1982 and Supp.1985); 9 C.F.R. Sec. 331.2.[1]
 
 
 3
 In 1981, D & W began selling meat "deli" pizzas at its retail stores. In 1982, D & W constructed, at a cost of approximately $190,000.00, a central commissary at its Grandville, Michigan supermarket, for preparation and distribution of meat pizzas to all thirteen stores. The pizza-making area is connected to the main shopping area of the Grandville store by two swinging doors with windows. D & W claims to have constructed the centralized facility to improve quality control, cleanliness and efficiency. For delivery, D & W also purchased, at a cost of approximately $40,000.00, and uses a specially-equipped refrigerated truck.
 
 
 4
 It is undisputed that the pizzas thus-produced by D & W are "meat food products," as defined in 21 U.S.C. Sec. 601(j) (1982); 9 C.F.R. Sec. 301.2(vv), that are "prepared" at the central facility. 21 U.S.C. Sec. 601(1) (1982); 9 C.F.R. Sec. 301.2(y). The FMIA requires the Secretary to examine and inspect "all meat food products prepared for commerce in any slaughtering, meat-canning, salting, packing, rendering or similar establishment...." 21 U.S.C. Sec. 606 (emphasis added). Despite the fact that the meats used in preparing the pizzas have previously been inspected by the USDA, the Secretary argues that D & W's central facility is a "packing ... or similar establishment" which must be inspected because of the slicing of pepperoni and sausage that occurs there. The Secretary further contends that D & W must remodel parts of its facility before it will be in compliance with the regulations implementing the continuous inspection provisions.
 
 
 5
 The district court, however, found that D & W's facility is not a "packing ... or similar establishment," but a retail facility, not covered by the provisions of Sec. 606. D & W Food Centers, Inc. v. Block, No. G83-844 CA1, slip op. at 6-15 (W.D.Mich., July 20, 1984).[2] In the alternative, the court concluded that even if the Secretary's interpretation of Sec. 606 were correct, it could not stand, because it would constitute a "rule" of "general applicability," invalid under the Administrative Procedure Act for lack of publication. 5 U.S.C. Sec. 552(a)(1)(D) (1982). The Secretary challenges each conclusion of law.
 
 II
 
 6
 Because any one of the conclusions of the district court constitutes an independent ground for its decision, the Secretary would be entitled to prevail only if he were correct on each point.
 
 
 7
 * The Secretary concedes that a grocery store that prepared and marketed meat pizzas for sale therein would not be a "packing ... or similar establishment" subject to continuous inspection under Sec. 606. He contends, however, that in preparing meat pizzas at its central facility and transporting those pizzas for sale to its other twelve stores, D & W becomes a "packing ... or similar establishment" within the meaning of that section.
 
 
 8
 In reaching the conclusion that D & W's operation is not covered by Sec. 606, the district court relied in part on an opinion by the Attorney General of the United States (AG). In 1972, the AG reviewed the language and the legislative history of Sec. 606, and concluded that Congress had intended that "a retail establishment normally would not be considered an establishment 'similar' to a slaughtering, meat-packing, canning or rendering plant." 42 Op.Att'y Gen. 459, 461 (1972). The AG noted that the facilities to which establishments must be "similar" in order to be covered by Sec. 606--slaughtering, canning, salting, packing or rendering plants--all were "usually wholesale businesses." Id. The AG thought it clear that "the obvious differences in the marketing functions" of these two kinds of businesses, id., suggested that Sec. 606 was not intended to provide universal coverage of all meat preparation facilities (except those expressly exempted), and indeed suggested the reverse:
 
 
 9
 that retail establishments like ordinary grocery stores and restaurants are not, as such, covered by the inspection and sanitation provisions ... regardless of their location and whether or not they offer their products for sale interstate.
 
 Id. at 466.[3]
 
 10
 While conceding that Sec. 606 was not intended to reach ordinary grocery stores, the Secretary urges that the district court erred because D & W's operation may not be characterized as an ordinary grocery store. Quoting the AG's opinion, the Secretary characterizes D & W's operation as a "new type of specialized processing establishment," a category of facility analogous to a packing house which the AG expressly noted would not be exempt from Sec. 606. 42 Op.Att'y Gen. at 466. As support for his position, the Secretary points out that unlike "strict retail activities," D & W's operation involves "shipment" of goods "after processing" in one store for sale in another. Safeway Stores, Inc. v. Freeman, 369 F.2d 952, 955 n. 6 (D.C.Cir.1966). Relying on this footnote in Safeway, the Secretary claims that D & W's practice of selling its pizzas in stores other than the store of preparation brings the operation within the purview of Sec. 606.
 
 
 11
 The Secretary's attempt to use Safeway to show that D & W is a "packer" because its operation involves "shipment ... after processing" is misguided. The court in Safeway held that nationwide food chains that operated centralized meat processing plants, where carcasses were broken, boned and trimmed, and beef was corned, made into sandwich spread, or sliced and wrapped, were properly found by the Secretary to be within the definition of "packer" in the Packers and Stockyards Act of 1921, 7 U.S.C. Secs. 181-229 (1982) (the Stockyards Act). 369 F.2d at 954-55. The statute in question included "any person engaged in the business ... of manufacturing or preparing meats or meat products for sale or shipment in commerce." 7 U.S.C. Sec. 191(b). The case is distinguishable in at least two important regards.
 
 
 12
 First, although the Stockyards Act's definition of "packer" is similar to that in the FMIA, the statutes have quite different purposes. The FMIA is a public health statute, aimed at "preventing the use in commerce of meat and meat food products which are adulterated...." 21 U.S.C. Sec. 603(a) (1982). In contrast, the Stockyards Act is a fair trade practices law, and "the 'chief evil' at which it was aimed was 'the monopoly of the packers, enabling them unduly and arbitrarily to ...' " injure consumers and suppliers by controlling pricing. Mahon v. Stowers, 416 U.S. 100, 106, 94 S.Ct. 1626, 1629, 40 L.Ed.2d 79 (1974) (per curiam) (citation omitted). Identifying "packers" properly subject to the provisions of the Stockyards Act thus is only limited authority, if any, for the proposition that even similar businesses should be "packers" for purposes of the FMIA.
 
 
 13
 The second important distinction between Safeway and the instant case is that the scope of the chains' operations in Safeway was enormous. Hundreds of millions of pounds of raw meat, including whole carcasses, were processed by the chains in Safeway, thus making their central facilities resemble packing houses much more closely than the thirteen-store supplier in the present case. In reaching its decision, the Safeway court relied on the large scope of the chains' operations as support for its conclusion that they should be treated as packers. Safeway, 369 F.2d at 956 & n. 12 (chains should be treated as packers because they "buy for 6,684 stores doing over $8,033,893,421 of business a year," having "absorbed part of the preparation and manufacturing function ... that the 'Big Five' formerly performed"). In contrast, under the USDA's own regulations, D & W's operation apparently continues to qualify as a "retail" establishment in terms of quantities prepared and sold.[4] While surely D & W makes more pizzas at its central facility than it could sell at one store, we are not persuaded that this factor permits the Secretary to disregard his other regulations regarding the size and type of operation that should be designated as "retail." See 42 Op.Att'y Gen. at 461.
 
 
 14
 Further consideration of the purpose of the FMIA confirms our conclusion that the definition of "packer" in the FMIA should be read more narrowly than the Secretary insists Safeway teaches. This statute finds it "essential in the public interest that the health and welfare of consumers be protected by assuring that meat and meat food products distributed to them are wholesome, not adulterated, and properly marked, labeled and packaged." 21 U.S.C. Sec. 602. Thus, it is clear that the FMIA authorizes the Secretary to designate businesses for continuous inspection primarily to reduce dangers to consumer health. The FMIA thus requires this court to judge whether the Secretary has correctly determined that this alleged "packing" house presents some danger to consumer health. In this regard it is significant, as the district court found below, that even the USDA's own Food Safety and Inspection Service has reported that operations like D & W's represent no significant public health problem.[5] Appendix 67. See Food Safety and Inspection Service, U.S. Department of Agriculture, Exemptions Study: An Analysis of the Meat and Poultry Exemption Provisions (January 1983) (Exemptions Study). Appendix 80-94.[6]
 
 
 15
 Finally, the only reason D & W even arguably is covered by Sec. 606 is an establishment "similar" to a "packing" house. But "packing" must be construed ejusdem generis with the other types of facilities listed, viz., slaughtering, meat-canning, salting or rendering. Obviously, D & W's operation is only with difficulty characterized as "similar" to the class of establishments covered by Sec. 606. That Congress intended Sec. 606 to require continuous inspection primarily of a class of establishments involved with large-scale sale and distribution of meat products is suggested by the AG's observation that the establishments Congress intended to reach were "usually wholesale businesses," 42 Op.Att'y Gen. at 462, and by the court's decision in Safeway, 369 F.2d at 955-56. Alternatively, we believe that a business of smaller scale might be subject to continuous inspection if its operations closely resembled those characterizing the class described in Sec. 606. Either type of business might implicate the public health problems that the Act aims at eradicating. 21 U.S.C. Sec. 602.
 
 
 16
 But a business like D & W's--neither large-scale, nor otherwise presenting the public health concerns created by the other members of the class enumerated in Sec. 606--seems an inappropriate candidate for membership in that class. In neither scope nor nature does D & W's operation present the public health concerns that led Congress to subject "packing" houses to the inspection provisions of the FMIA. Quite the contrary, the differences between D & W's operation and those of an "ordinary" grocery store are slight, while the similarities are apparent. D & W's relatively small assembly operation in fact takes place in a grocery store. It probably is as visible to customers as any similar operation whose sales are limited to one store. While the specific purchasers will not have observed preparation, the class of consumers will have been represented by shoppers in the Grandville store, where sanitary conditions may be observed. The meats used by D & W's operation already have been subject to federal inspection at earlier levels, and all sales of the pizzas are to retail customers.
 
 
 17
 To ignore this plethora of factors arguing against applicability of Sec. 606 to D & W, and focus instead on a wooden reading of the definition of "prepared" (including "cut up" or "otherwise manufactured or processed," 21 U.S.C. Sec. 601(1)), and Safeway's concern with "shipment ... after processing," would broaden Sec. 606's coverage considerably beyond that suggested in the statute, in Safeway, or in the AG's opinion. In the absence of any suggestion that D & W's operation implicates public health concerns at a level even approaching that suggested in those authorities, we decline to adopt such an expansive view of the statute.
 
 
 18
 For all of these reasons, we agree with the district court's conclusion that D & W's operation may not be characterized as "similar" to a "packing" house, and therefore that it stands outside the reach of Sec. 606.
 
 B
 
 19
 The Secretary further argues, however, that even if D & W's construction of Sec. 606 might be thought more persuasive than his own, the Secretary's interpretation must be upheld under the deference due to an administrative agency's construction of a statute that it administers. See, e.g., Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-45, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694, 702-04 (1984). The Secretary correctly states that in order for his interpretation to be accepted, this court ordinarily need not find that it was the only permissible one, as long as it constitutes a sufficiently rational interpretation of the FMIA. See, e.g., Chemical Manufacturers Association v. Natural Resources Defense Council, Inc., --- U.S. ----, ----, 105 S.Ct. 1102, 1107, 84 L.Ed.2d 90, 98 (1985).
 
 
 20
 We first note that it is not clear that the Secretary's construction of Sec. 606 would be sufficiently rational to warrant judicial deference, in light of our earlier discussion. We have already concluded that D & W's is the best reading of the statute; however, we need not here decide whether this reading could stand against a less plausible, but still tenable USDA rule, because we conclude that the Secretary's construction of Sec. 606 represents an "interpretation of general applicability," required to be published by the Administrative Procedure Act. 5 U.S.C. Sec. 552(a)(1)(D). Because this construction of Sec. 606 never has been published, it may not be enforced against D & W or any non-complying party.
 
 
 21
 An agency pronouncement must be published if it is of such a nature that knowledge of it is needed to keep parties informed of the agency's requirement as a guide for their conduct. United States v. Hayes, 325 F.2d 307, 309 (4th Cir.1963) (per curiam). An interpretation is not "of general applicability" if (1) only a clarification or explanation of existing laws is expressed, and (2) the interpretation results in no significant impact on any segment of the public. Anderson v. Butz, 550 F.2d 459, 463 (9th Cir.1977). Agencies need not publish "interpretative rules, general statements of policy, or rules of agency organization, procedure or practice." 5 U.S.C. Sec. 553(b)(A). However, a rule required to be published which is not published is void, and may not be enforced against a non-complying party. Northern California Power Agency v. Morton, 396 F.Supp. 1187 (D.D.C.1975), aff'd sub nom. Northern California Power Agency v. Kleppe, 539 F.2d 243 (D.C.Cir.1976). See also Anderson, 550 F.2d at 463; 5 U.S.C. Sec. 552(a)(1).
 
 
 22
 Under these standards, it is clear that the Secretary's reading of Sec. 606--that regardless of its size or of potential adverse impact on public health, any centralized grocery kitchen that prepares any meat food products for sale off-premises is a "packing ... or similar establishment"--does more than interpret an existing law. D & W correctly argues that the policy will affect every intrastate-selling grocery store in any one of the twenty-seven designated states that may wish to prepare meat food products at one of its stores for wider distribution to its other locations. Thus, the rule certainly might result in significant impact on at least that segment of the public. Anderson, 550 F.2d at 463. And since the Secretary's rule departs from the literal language of the statute and of the AG's opinion, it would do violence to plain English to characterize the rule as only a "clarification" of existing law. Id. We therefore conclude that, even if the Secretary's construction of Sec. 606 would otherwise be entitled to judicial deference, that construction may not be adopted here, where D & W was deprived of notice and the opportunity to comment before the rule became effective, and especially before it had expended a large sum of money on construction of the centralized facility.
 
 C
 
 23
 Any remaining doubt that the Secretary's construction of Sec. 606 must be rejected disappears when we consider the criminal provisions of the FMIA. Section 676(a) provides criminal penalties for violation of any section of the Act. No principle of law is better established than the necessity of the criminal law speaking clearly. Accordingly, courts are bound to construe narrowly the applicability of any criminal statute. E.g., United States v. Bass, 404 U.S. 336, 346-48, 92 S.Ct. 515, 521-23, 30 L.Ed.2d 488 (1971). Here, the Secretary invites us to adopt a construction of "packing ... or similar establishment" that is not plain in the statute or its regulations; that may remain unknown to most grocery stores for its lack of publication; and that might subject this plaintiff and hundreds of other similarly-situated businesses to criminal liability. We decline the invitation, and hold that D & W's centralized pizza-making operation is not subject to the provisions of 21 U.S.C. Sec. 606.
 
 
 24
 Accordingly, we AFFIRM the judgment of the district court.
 
 
 
 [1]
 This litigation concerns only whether D & W is subject to the continuous inspection requirements of Sec. 606. The trial court noted, and the parties do not dispute, that D & W remains subject to other USDA regulations, including those relating to adulteration and misbranding. 21 U.S.C. Sec. 610(c), (d) (1982); 9 C.F.R. Sec. 303.1(e). See also 21 U.S.C. Secs. 601(m), (n) (1982); 42 Op. Att'y Gen. 459, 473-74 (1972). Likewise, the district court found that D & W currently is subject to regular inspection by the Food and Drug Administration (FDA), 21 U.S.C. Sec. 374(a) (1982), and to at least some inspection by state and local authorities
 
 
 [2]
 The district court also concluded that even if D & W's central facility otherwise would be subject to Sec. 606, the facility is exempted from that section by Sec. 661(c)(2), which provides that Sec. 606:
 shall not apply to operations of types traditionally and usually conducted at retail stores and restaurants, when conducted at any retail store or restaurant or similar retail-type establishment for sale in normal retail quantities or service of such articles to consumers at such establishments if such establishments are subject to such inspection provisions only under this paragraph (c).
 21 U.S.C. Sec. 661(c)(2). Because we conclude that D & W's operation is not subject to Sec. 606, we have no occasion to consider the district court's alternative conclusion of exemption under Sec. 661. Likewise, we need not consider the arguments on whether the Secretary's interpretation and application of Sec. 661(c)(2) is a "rule" required to be published under the Administrative Procedure Act. 5 U.S.C. Sec. 552(a)(1)(D) (1982).
 
 
 [3]
 The AG's opinion was not altered by the presence of the specific retail exemption in Sec. 661(c)(2). Conceding that the latter provision was "somewhat redundant," the AG nevertheless concluded that neither the language nor legislative history of Sec. 606 indicated intent to reach all establishments dealing in meat preparation absent an express exemption under Sec. 661(c)(2). Id. at 467-68. Since this provision was added subsequent to the original enactment of Sec. 606, the partial redundancy does not render nugatory an otherwise sensible construction of the statute. United States v. Bass, 404 U.S. 336, 343-45, 92 S.Ct. 515, 520-21, 30 L.Ed.2d 488 (1971)
 
 
 [4]
 The district court found, apparently correctly, that the pizzas are sold in "normal retail quantities," i.e., in units containing less than one-half carcass of meat. 9 C.F.R. Sec. 303.1(d)(2)(ii). In addition, the court found that the only preparatory operations--slicing and wrapping--were "operations of types traditionally and usually conducted at retail stores." 9 C.F.R. Sec. 303.1(d)(2)(i)(a), (e). Finally, D & W operates only "retail stores," based on proportion of sales to consumers, use of only federally-inspected meat and other factors listed in 9 C.F.R. Sec. 303.1(d)(2)(iii)
 
 
 [5]
 Transportation of fresh pizzas to twelve different locations certainly adds at least marginally to the danger of spoilage. It appears that the statute treats spoilage as a species of "adulteration." See 21 U.S.C. Sec. 601(m)(3) (product which "consists in whole or in part of any filthy, putrid, or decomposed substance or is for any other reason unsound, unhealthful, unwholesome, or otherwise unfit for human food"). Since it is conceded that D & W remains liable for allowing products to become "adulterated" while in shipment or in storage, 21 U.S.C. Sec. 610(c), (d), it is apparent that the danger of spoilage after "packing" is intended to be regulated not by inspection under Sec. 606, but by the criminal sanctions authorized by Secs. 610 and 676. Rather, Sec. 606 aims only to ensure the healthful and sanitary condition of meat food products when they leave the "packing" facility. See 30 Op.Att'y Gen. 164, 165 (1913) (the continuous inspection provisions of the Act do not "reach meats which have become spoiled after leaving an official establishment, but which are still in interstate commerce"), cited with approval in 42 Op.Att'y Gen. at 463. In addition, reinspection of the condition of previously-inspected meat food products at the retail level has been delegated by Congress to the FDA. 42 Op.Att'y Gen. at 465
 
 
 [6]
 The study discussed reports from the food industry and staffs within the USDA, indicating that previously-inspected products that undergo no significant further processing (like the sausage and pepperoni used in processing pizzas) "pose no new health issues." Appendix 89. The study agreed with this conclusion, and concluded that "[t]he analysis has not identified any major health and safety reasons for not exempting from inspection pizza assembly operations...." Appendix 91